VERN E. ANTRY *et al.*, Petitioners, v. ILLINOIS EDUCATIONAL LA-
BOR RELATIONS BOARD *et al.*, Respondents.

Fourth District No. 4—88—0314

Opinion filed March 15, 1990.

224

226

James A. Rapp, of Hutmacher, Rapp & Ortbal, P.C., of Quincy, and Bruce N. Cameron and John C. Scully, both of National Right To Work Legal Defense Foundation, of Springfield, Virginia, for petitioners.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Sandra J. Holman, of Illinois Education Association, of Springfield, and Robert H. Chanin and Bruce R. Lerner, both of Bredhoff & Kaiser, of Washington, D.C., for respondent Sparta Education Association.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

In *Shinn v. Illinois Educational Labor Relations Board* (1989), 183 Ill. App. 3d 915, 539 N.E.2d 847, this court held educational employees who are not members of educational labor unions

and who are required to pay "fair-share" fees to a union which is the exclusive bargaining representative of the bargaining unit in which they are employed, must file written objections in order to obtain refunds of the portions of their fair-share fees attributable to union activities unrelated to collective bargaining. In the present case, the principal question is whether the Illinois Educational Labor Relations Board (IELRB) properly determined the percentage of fair-share fees attributable to union activities unrelated to collective bargaining and thus refundable to objecting fee payors. An additional issue of major significance is whether nonmember fee payors were provided with information relevant to their fees sufficient to enable them to decide whether to object to the fees.

The rationale for the requirement that nonmembers of unions pay fair-share fees to the unions which are the exclusive bargaining representatives, as well as the tension between this requirement and the first amendment right of freedom of association for the advancement of ideas, was described in our opinion in *Shinn*, as were the Illinois statutes and the IELRB administrative regulations governing fair-share fees. Essentially, the full amount of union dues (excluding amounts attributable to political activities) may be deemed owing from a nonmember salary as a fair-share fee, subject to reduction upon the filing of objections. We will not now repeat what we stated in *Shinn* concerning these matters.

The present case represents a consolidation of the objections filed with the IELRB to fair-share fees for the 1985-86 and 1986-87 school years collected under the terms of at least 52 separate educational labor contracts from 207 public school and community college employees, hereafter referred to as the petitioners. The fair-share fees here at issue consist of three components—(1) amounts equivalent to the dues of the National Education Association (NEA); (2) amounts equivalent to the dues of the Illinois Education Association (IEA); and (3) amounts equivalent to the dues of local educational labor unions.

After consolidating the cases involving objections to fair-share fees for 1985-86 and 1986-87, the IELRB held extensive hearings on the objections. The first hearing was held October 20, 1986, and the final session was held on April 14, 1987. Following the submission of briefs and the presentation of oral arguments on November 27, 1987, the IELRB ruled upon the objections in an opinion and order issued April 8, 1988. *NEA, IEA, DuQoin Education Association*, 4 Pub. Employee Rep. (Ill.) par. 1064, case No. 85—FS—0002—S (Illinois Educational Labor Relations Board, April 8, 1988).

In its opinion and order, the IELRB held (1) as a result of the ob-

jectors having been provided with inadequate notice and information concerning the amount of their fair-share fees, the unions are not entitled to any fair-share fees from the objectors for the period preceding April 10, 1986; (2) the notices and information concerning fair-share fees which the unions sent to nonmember fee payors on April 10, 1986, complied with constitutional requirements; (3) individual hearings are not required before fair-share fees may be deducted from nonmembers' salaries; (4) the delay in the IELRB's adjudication of the objections here at issue did not violate the petitioners' constitutional rights; (5) the IELRB's consolidation of all outstanding fair-share fee objections which concerned the NEA, the IEA, and their local affiliates did not violate any of the objectors' constitutional rights; (6) nonmember fee payors must pay a proportionate share of the expenses of the NEA and the IEA which are related to collective bargaining, even if the activities of those organizations do not directly benefit their affiliated local unions in the school districts in which petitioners are employed; (7) fair-share fees may be calculated by determining the percentage of union expenses related to collective bargaining and multiplying that percentage by the amount of the union's dues; (8) for the 1985-86 school year, the NEA is entitled to fair-share fees equal to 57.19% of its dues, the IEA to fair-share fees equal to 57.40% of its dues, and the local unions to fair-share fees equal to 57.34% of their dues; and (9) for the 1986-87 school year, the NEA is entitled to fair-share fees of 57.19% of its dues, the IEA to fair-share fees of 56.25% of its dues, and the local unions' fair-share fees equal to 56.53% of their dues.

## I. ADEQUACY OF NOTICE

■ The first question presented for our review is whether, in informing petitioners of the fair-share fees which they were required to pay, the unions provided information concerning the fees sufficient to comply with the requirements of the Supreme Court's decision in *Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson* (1986), 475 U.S. 292, 89 L. Ed. 2d 232, 106 S. Ct. 1066. In *Hudson*, the Court held a system established by the Chicago teacher's union for informing nonmembers of their obligations to pay fair-share fees and handling objections to the fees contained three fundamental flaws. First, the procedure did not protect against the possibility of the objectors' funds being temporarily used for an improper purpose such as by providing for an escrow of disputed amounts pending resolution of the objections. Second, and most importantly for our purposes here, the procedure did not provide nonmembers with adequate information

about the basis for the fair-share fees. With respect to this matter, the Court stated:

> "In *Abood* [*v. Detroit Board of Education* (1977), 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782], we reiterated that the nonunion employee has the burden of raising an objection, but that the union retains the burden of proof: ' "Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion." ' *Abood*, 431 U.S. at 239-40, n.40, 52 L. Ed. 2d 261, 97 S. Ct. 1782, quoting *Railway Clerks v. Allen*, 373 U.S. 113, 122, 10 L. Ed. 2d 235, 83 S. Ct. 1158 (1963).[16] Basic considerations of fairness, as well as concern for the First Amendment rights at stake, also dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee. Leaving the nonunion employees in the dark about the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood*.

In this case, the original information given to the nonunion employees was inadequate. Instead of identifying the expenditures for collective bargaining and contract administration that had been provided for the benefit of nonmembers as well as members—and for which nonmembers as well as members can fairly be charged a fee—the Union identified the amount that it admittedly had expended for purposes that did not benefit dissenting nonmembers. An acknowledgment that nonmembers would not be required to pay any part of 5% of the Union's total annual expenditures was not an adequate disclosure of the reasons why they were required to pay their share of 95%.[18]

---

[16]The nonmember's 'burden' is simply the obligation to make his objection known. See *Machinists v. Street*, 367 U.S., at 774, 6 L. Ed. 2d 1141, 81 S. Ct. 1784 ('[D]issent is not to be presumed—it must affirmatively be made known to the union by the dissenting employee'); *Railway Clerks v. Allen*, 373 U.S., at 119, 10 L. Ed. 2d 235, 83 S. Ct. 1158; *Abood*, 431 U.S., at 238, 52 L. Ed. 2d 261, 97 S. Ct. 1782.

\* \* \*

[18]We continue to recognize that there are practical reasons why '[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.' *Allen*, 373 U.S., at 122, 10 L. Ed. 2d 235, 83 S. Ct. 1158, quoted

in *Abood*, 431 U.S., at 239-240, n.40, 52 L. Ed. 2d 261, 97 S. Ct. 1782. Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The Union need not provide nonmembers with an exhaustive and detailed list of all its expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor. With respect to an item such as the Union's payment of $2,167,000 to its affiliated state and national labor organizations, *** for instance, either a showing that none of it was used to subsidize activities for which nonmembers may not be charged, or an explanation of the share that was so used was surely required." *Hudson,* 475 U.S. at 306-07 & nn.16, 18, 89 L. Ed. 2d at 246-47 & nn.16, 18, 106 S. Ct. at 1075-76 & nn.16, 18.

Third, the Court held the union's procedures governing objections were defective because they did not provide for a reasonably prompt decision by an impartial decision maker. The Court stated an objecting nonmember fee payor is entitled to have his objections addressed "in an expeditious, fair, and objective manner." *Hudson,* 475 U.S. at 307, 89 L. Ed. 2d at 247, 106 S. Ct. at 1076.

In the present case, the IEA on April 10, 1986, sent to all fee payors of its local unions a letter informing them of their obligation to pay fair-share fees for the 1985-86 school year. The letter informed them the fee which they had been assessed "is equal to the amount of all the local, state, and national dues, not exceeding the amount uniformly required of members. This amount does not include any contribution related to the election or support of any candidate for political office." The letter further informed fee payors of their right to object to the amount of the fee and provided the addresses of IELRB offices at which the necessary forms and other information could be obtained. Furthermore, the letter informed fee payors that following a full hearing in which the objectors would have the right to participate, the IELRB would ultimately determine the amounts of the fair-share fees which could be properly charged to objecting fee payors for the 1985-86 school year. The letter also explained to fee payors that pending resolution of objections for the 1985-86 school year, the fair-share fee charged fee payors who objected would be reduced to 86.7% of the dues uniformly required of members, which was the amount of the fair-share fee which was finally determined to be required of nonmembers with respect to the 1984-85 school year. Finally, the letter advised fee payors the IELRB might conclude objecting fee payors must pay a fair-share fee for the 1985-86 school year of more or less than 86.7% of the dues uniformly required of members.

Enclosed with the IEA's April 10, 1986, letter were copies of the

following documents:

(1) NEA program budget for 1985-86. This included statements of the NEA's income as well as its expenditures for each department. Also included were rather detailed descriptions of the functions of each of the NEA departments and programs for which expenditure data was provided. For instance, the portions of this document covering the membership promotion and recruitment activities and leadership activities of the NEA's affiliate services area read:

| | 1984-85 | 1985-86 |
|---|---|---|
| "MEMBERSHIP PROMOTION AND RECRUITMENT | $2,817,174 | $2,867,026 |
| Program 1.1: Develop membership promotion materials and design membership recruitment programs to assist state affiliates in maintaining 90% of potential. | 377,298 | 239,806 |
| Program 1.2: Provide direct assistance for up to 12 targeted state affiliates in the implementation of a comprehensive membership recruitment program based on building effective locals and supporting state affiliate organizational and program development. | 1,813,788 | 2,174,355 |
| Program 1.3: Implement a program of membership recruitment and service for retired members that includes pre-retirement seminars, publications, a newsletter, support for an advisory committee, and an annual meeting. | 441,569 | 269,067 |
| Program 1.4: Develop and implement an NEA student member program. Provide service component to promote the program through development of materials and model state and institutional programs. Provide staff support to the Student Advisory Committee. | 184,519 | 183,798 |
| LEADERSHIP PROGRAM | $1,252,490 | $1,573,538 |
| Program 2.1: Provide training through the regional offices to affiliate leaders as an integral part of Affiliate Services projects in membership recruitment and development, organizing, negotiations, and contract enforcement. Develop comprehensive training projects with state affiliates. | 535,320 | 819,538 |
| Program 2.2: Plan and conduct one summer | 134,717 | 143,232 |

conference for state presidents, presidents-elect/
vice-presidents, secretary-treasurers/treasurers.
Plan and conduct six regional workshops/meetings
for state presidents.

Program 2.3: Provide for the coordination of 166,206 241,151
NEA urban data retrieval, information dissemina-
tion, and problem solving. Plan and conduct three
regional seminars for leadership from the 200
largest locals and up to 30 urban settings grouped
according to experience; provide support services
to NCUEA.

Program 2.4: Provide training consultation and 416,247 359,717
support for regional staff; research, develop, and
validate one new package or revise an existing
leadership training package.

Program 2.5: Plan and conduct one pre-conven- 10,000
tion conference for student members. Provide
specialized training to student chair following
election at preconvention conference."

 This document was not audited.

 (2) Copies of the NEA's financial statements for the fiscal years
ending August 31, 1985, and August 31, 1984. These statements were
audited by the accounting firm of Coopers & Lybrand. They included
statements of the NEA's receipts as well as its expenditures arranged
according to the same areas of operation (such as affiliate services)
described in the NEA's program budget.

 (3) A copy of a 40-page report of the NEA's representation fee
umpire for the 1984-85 school year. This report stated a preliminary
conclusion that 75.98% of the NEA expenditures for this school year
were for activities related to collective bargaining. The report further
stated since NEA expenditures for legal services and for grants to
State and local affiliates for legal services had to be determined on a
State-by-State basis, the final NEA fair-share fee percentages for
each State would be dependent on the amount the NEA spent for
chargeable legal services and litigation in each State. After NEA ex-
penditures for legal services which benefitted affiliates in each State
would be factored into the calculations for each State, the average
NEA fair-share fee would be approximately 85% of annual dues. This
report states the amounts spent on each of the NEA areas described
in the NEA's program budget which the representation fee umpire
determined were attributable to activities unrelated to collective bar-
gaining.

(4) IEA budget for 1985-86. This lists expenditures by categories such as president's office, *ad hoc* committees, budget committee, School Service Personnel Council, Higher Education Council, *et cetera*. Within each of these categories, expenses are further broken down into such classifications as professional salaries, legal and secretarial services, rent, telephone, utilities, real estate tax, and audit expenses. No statement of the specific functions of each office or division of the IEA is included.

(5) The IEA's audited financial statements for the fiscal year ended June 30, 1985. This statement included a balance sheet and a statement of major categories of income and expenses.

(6) Report of the IEA representation fee umpire for the 1983-84 school year. This report states that for this school year, 88.22% of all IEA expenditures were for activities related to collective bargaining and thus chargeable to fee payors. This document contains descriptions of the activities of each major IEA program area (such as governance, membership services, and public affairs) and statements of the percentages of the expenditures for these programs which the fee umpire found were unrelated to collective bargaining.

(7) Copy of an unpublished United States District Court decision in *Dolan v. Rockford School District No. 205* (N.D. Ill. Aug. 19, 1985), No. 84—C—20209. This decision determined the preliminary combined NEA-IEA fair-share fee to be charged objectors for the 1984-85 school year was 86.71% of total NEA and IEA dues. The court recognized that following the conclusion of the school year, this figure could be adjusted downward on the basis of an arbitrator's determination of the unions' chargeable expenditures. As the basis for its decision, the court relied primarily on the report of the NEA's representation fee umpire for the 1983-84 school year.

On August 21, 1986, the IEA wrote fee payors concerning fair-share fees for the 1986-87 school year. This letter contains most of the statements included in the IEA's letter of April 10, 1986. In addition, it states the fees of dissenting fair-share fee payors will be reduced, upon the filing of an objection, to 84.69% of the dues uniformly required of members, pending resolution of the objections by the IELRB. The letter also informed fee payors of the import of the recent United States Supreme Court decisions regarding the obligation of nonmembers of unions within bargaining units to pay fair-share fees. Furthermore, fee payors were informed, with respect to the 1984-85 school year, the NEA representation fee umpire determined 24.02% of the NEA's expenditures were for activities unrelated to collective bargaining, and for the same period a representation fee

umpire determined 11.78% of the IEA's expenditures were devoted to nonchargeable activities. The letter then states:

"We believe the [local educational labor unions] expend almost nothing on non-chargeable activities because their primary responsibilities are collective bargaining, contract negotiation, contract administration and grievance processing—all chargeable activities. However, out of an abundance of caution, and giving objecting fee payors the benefit of the doubt, we applied the IEA non-chargeable percentage of 11.78% to the locals' expenditures. After doing so, we computed the average weighted percentage and concluded that, at most, 15.31% of the [local unions'] fair-share fee funded non-chargeable activities."

The letter concluded with a statement that (1) since experience demonstrated the IEA's and NEA's categories of expenditures do not vary significantly from year to year, and (2) because the IELRB would ultimately determine the actual amount of the fair-share fees to be charged objectors for the 1986-87 school year, it was deemed appropriate to rely on the fair-share percentages applicable to prior years in fixing the preliminary fair-share fee to be charged objectors for the 1986-87 school year.

Enclosed with this letter were copies of the following documents:

(1) The NEA's program budget for the fiscal year 1986-87. The format of this document is substantially the same as that of the program budget for the 1985-86 fiscal year.

(2) The NEA's program budget for fiscal year 1985-86.

(3) The NEA's audited financial statements for the fiscal years ending August 31, 1985, and August 31, 1984.

(4) The report of the NEA's representation fee umpire for the 1984-85 school year.

(5) The IEA budget for 1985-86.

(6) The IEA budget for 1986-87. The format of this document is the same as that of the 1985-86 IEA budget.

(7) The IEA's audited financial statements for the fiscal year ended June 30, 1985.

(8) A statement of the IEA's accrued preaudit expenses for the 1985-86 fiscal year. This document lists expenditures by general categories, such as "Staff Training and Development," "Interest Expense," "Director of Membership Services," "Memb. Communications, Mgr./Uniserv Area Coord.," "Bylaws Committee," and "Higher Education Council."

(9) Report of IEA-NEA representation fee umpire for the 1983-84 school year.

(10) Unpublished United States District Court decision in *Dolan v. Rockford School District No. 205* (N.D. Ill. Aug. 19, 1985), No. 84—C—20209.

In holding the petitioners were provided with adequate information regarding their fair-share fees, the IELRB stated that in view of the Supreme Court's decision in *Hudson,* an objection to a fair-share fee can serve two purposes: (1) communication of dissent to the union, and (2) a challenge to the union to prove its claims of chargeable expenses. The IELRB further stated *Hudson* requires an assessment of the adequacy of an explanation of a fair-share fee in light of the burden which the union has placed on potential objectors. The IELRB stated in each fair-share case, the nonmember has the burden of deciding whether to object, and the type of information which a fee payor requires to make that decision depends on the nature of the decision.

The IELRB noted that here, unlike in *Hudson,* nonmembers had to dissent in order to obtain an advance reduction of their fair-share fees, and the filing of objections forced the unions to prove their entitlement to any fees. The IELRB also observed the notices sent to nonmembers in this case did not claim all nonchargeable expenses had been eliminated from the fair-share fees and contained no implication that an objection would be futile unless the fee payor was prepared to challenge the unions' calculations. Rather, the notices stated the IELRB would ultimately determine the precise amount of the fair-share fees. The IELRB stated inclusion in the information sent to petitioners of a more precise functional breakdown of the unions' expenditures was unwarranted in view of the minimal burden which was placed on potential objectors by the procedures for objection.

Furthermore, the IELRB held an auditor's opinion as to which expenses are chargeable and nonchargeable need not be included in the information concerning fair-share fees which is initially sent to nonmembers. The IELRB concluded petitioners were provided with information adequate to enable them to determine whether to object to their fair-share fees.

The petitioners argue the information with which they were initially provided concerning their fair-share fees for the two school years in question was inadequate to enable them to gauge the propriety of their fair-share fees, because it did not sufficiently state what expenditures were for activities deemed related to collective bargaining and what expenditures were for activities which the unions regard as unrelated to collective bargaining. Also, petitioners argue that since the fee umpires were not neutral decision makers within the

meaning of *Hudson*, and their decisions did not discuss union expenditures for the current and immediately preceding school years, their decisions did not help to satisfy the applicable information requirements. Petitioners also assert the representation fee umpires' reports are deficient because they are not audited. Petitioners argue that, at the minimum, the IEA expenditures should have been broken down on a "functional" basis by listing, for instance, amounts spent on fund-raising, collective bargaining, organizing, *et cetera*, rather than on an "object" basis by listing amounts spent for salaries, light, heat, rent, *et cetera*.

The petitioners further note, before having to decide whether to object, they were provided with no information whatsoever concerning the bases of the fair-share fees claimed by their local unions. Petitioners contend, in view of the fact that it is the local unions which actually perform collective bargaining on their behalf, an assumption the locals expend no greater a percentage of their funds on chargeable activities than do the NEA and the IEA is not an effective substitute for specific financial information concerning the local unions.

Petitioners state the IELRB's decision in effect requires payors of fair-share fees to object and, subsequently, go through a lengthy administrative process in order to receive information concerning their fees. The petitioners maintain no court or administrative agency has previously adopted the IELRB's position with respect to this issue and focused on the burden imposed on potential objectors in determining the type of information concerning fair-share fees which unions must initially provide to nonmember fee payors.

In its argument on appeal, the IELRB states that before the *Hudson* decision, an objection by a fee payor constituted the means by which dissent was communicated to the unions. The IELRB asserts *Hudson*, however, recognized the right of objectors to compel unions to prove the validity of their calculations of fair-share fees before a neutral decision maker. Therefore, the IELRB argues, a fair-share fee objection filed subsequent to *Hudson* serves the dual purpose of communicating dissent to the unions and challenging them to prove their claims of chargeable expenses. The IELRB notes that in *Hudson*, unlike in the present case, the union charged all nonmembers 95% of the dues charged members. Thus, argues the IELRB, the nonmembers involved in *Hudson* did not have an incentive to file objections. The IELRB notes that in the present case, by contrast, the fee payors had to file objections in order to obtain any reductions in the amount of their fair-share fees. The IELRB implies since the nonmembers in

the present case were informed objections would trigger an automatic reduction of their fair-share fees, they had a greater incentive to object than the nonmembers in *Hudson*. For this reason and because the filing of an objection triggers automatic review of the entire amounts of claimed representation fees by the IELRB, the IELRB asserts the nonmembers in this case had a lesser need for information concerning the amount of their fair-share fees than did the nonmembers in *Hudson*. The IELRB maintains objecting nonmembers being "burdened" by lengthy hearings is an inevitable result of the filing of objections to fair-share fees.

With respect to the fees charged nonmembers for the services of the local unions, the IELRB asserts the unions were not required to provide fee payors with information concerning the finances of the locals because (1) the letters to fee payors stated the locals spent almost nothing on activities unrelated to collective bargaining, (2) the local unions sought to collect fair-share fees in amounts equal only to the overall weighted chargeable percentages of IEA and NEA expenditures, and (3) nonmembers were only required to decide whether to express a general objection to the fair-share fees of the locals.

The IELRB argues, alternatively, that if this court holds the burden placed on potential objectors is not determinative of the required content of the notices of fair-share fees to which fee payors are entitled, the NEA met its burden of providing the petitioners with adequate information concerning its expenditures. The IELRB states the NEA's program budget revealed and explained the major categories of expenditures, the umpire report explained how the percentages of those expenditures chargeable to fee payors were calculated, and the information as to the NEA expenditures was audited by an accounting firm.

The unions maintain the sole purpose of *Hudson's* requirement that the unions provide information to nonmembers concerning fair-share fees is to ensure nonmembers have enough information to decide whether to object to the amount of the fees. The unions assert the information provided to nonmembers concerning the NEA's expenditures must be considered as a total package. The unions assert in assessing the adequacy of the information provided nonmembers, it is inappropriate to focus on only one or two particular documents included in the information package, as the petitioners have done with respect to the NEA's fee umpire report.

With regard to the information concerning the IEA expenditures, the unions argue when considered as a total package, the materials provided to fee payors satisfy *Hudson's* informational requirements.

The unions state the nonmembers were provided with copies of both the IEA budget and IEA umpire report, which contained descriptions of the major categories of IEA expenditures, as well as copies of audited IEA financial statements. With respect to the petitioners' contention the fee umpire report was prepared by an arbitrator who may have been partial to the IEA, the unions respond *Hudson* requires an impartial decision maker only at the stage of the proceedings at which the final determination is made as to the percentages of union dues chargeable to objectors—in this case the proceeding before the IELRB—and does not require an impartial decision maker at the point when the amount of the automatic reduction to be granted objectors as a preliminary matter is determined.

The unions do not dispute the information packets sent to nonmembers in April and August 1986 did not include financial statements or budgets of the local unions. The unions assert the presumption local unions expend at least as great a percentage of their funds on chargeable activities as do the NEA and IEA is intended to avoid the time, expense, and burden which would necessarily be involved in providing to nonmembers documents concerning the expenditures of the over 200 local teachers' unions in Illinois which collect fair-share fees. The unions maintain this presumption operates to the advantage of nonmembers, since the local unions invariably spend greater percentages of their budgets on chargeable activities than does the IEA. The unions assert in deciding whether to object to their local union fair-share fees, the petitioners simply had to decide whether or not to accept the locals' position a local union invariably spends more for activities related to collective bargaining than do the IEA and the NEA. If a nonmember does not agree with this presumption, argue the unions, the nonmember may file an objection, which then requires the local union to document this presumption in proceedings before the IELRB.

We conclude the petitioners were provided adequate information concerning the amount of their NEA and IEA fair-share fees which enabled them to decide whether to object to the fees. The fee payors were not "left in the dark" as to the basis for their fair-share fees. Instead, the documents provided them—which in the April 10, 1986, mailing consisted of 150 pages of data relating to union finances and in the August 21, 1986, mailing of over 200 pages of the same type of materials—come close to being an exhaustive and detailed list of all union expenditures, which the *Hudson* Court held need not be provided to fee payors. *Hudson*, 475 U.S. at 307 n.18, 89 L. Ed. 2d at 247 n.18, 106 S. Ct. at 1076 n.18.

Considered as a whole, the information which the fee payors received provided them with a complete picture of the expenditures of the NEA and the IEA for the time periods in question, and of the nature of the activities for which the expenditures were made. (See *Kuehn v. American Federation of State, County & Municipal Employees, Council No. 65* (Minn. App. 1989), 435 N.W.2d 130.) The evidence here supports the unions' claim that the amounts expended by the NEA and the IEA for their various activities did not change significantly from year to year. Thus, the fact the information provided fee payors to a large extent concerned expenditures for prior years did not detract from its usefulness in helping fee payors to decide whether to object to the amounts of their fair-share fees.

■ We do not consider the failure of the unions to provide fee payors with information as to the expenditures of the local unions—other than the statement of the presumption set forth in the IEA's August 21, 1986, letter to fee payors—that the percentages of expenditures of the locals which are not chargeable to nonmembers does not exceed the average weighted percentage of the nonchargeable expenditures of the NEA and the IEA—renders the information provided fee payors constitutionally inadequate. The notice of the use of this presumption was adequate to enable a fee payor to decide whether to object to his or her fair-share fees. (See *Hohe v. Casey* (M.D. Pa. 1988), 695 F. Supp. 814, 819, 129 L.R.R.M. 2491, 2494-95.) Although the April 10, 1986, letter did not contain a statement of the presumption, a fee payor could reasonably be expected to infer, on the basis of all of the information provided with that letter, the IEA had determined the chargeable percentage of local union dues was roughly equal to that of NEA and IEA dues. A fee payor dissatisfied with this determination could object to the amount of his or her fair-share fee. Upon the filing of objections to fair-share fees, the burden of establishing the validity of the initial determination of the chargeable percentage of local union expenditures shifts to the unions. (80 Ill. Adm. Code §1125.80(b) (Supp. 1986).) Thereafter, each local union, as to the fees over which an objection is filed, has to provide complete information concerning its finances at proceedings before the IELRB if it wants to collect any fair-share fees at all from objectors who are included in a bargaining unit it represents. We hold this procedure does not violate the constitutional rights of the payors of fair-share fees to local educational labor unions.

■ Petitioners' contentions concerning the alleged lack of neutrality on the part of the representation fee umpires and the lack of an auditor's report regarding the breakdown of the unions' expendi-

tures into the chargeable and nonchargeable categories, do not affect the validity of our conclusion regarding the adequacy of the information provided to fee payors. *Hudson* requires adjudication of *objections* to fair-share fees by an impartial decision maker. When nonmembers are first sent information regarding their fair-share fees, no objections to the amount of the fees are outstanding. Objections to fair-share fees are normally filed with the IELRB after receipt of the initial mailing containing union financial information. The IELRB then rules upon the objections. Obviously, under the Illinois procedure for handling objections to fair-share fees, the impartial decision maker referred to in *Hudson* is the IELRB and not the fee umpire. Thus, so long as objections to fair-share fees are adjudicated by the IELRB, alleged lack of neutrality on the part of the fee umpire who initially determines the amount of the fair-share fees on behalf of the unions is of no consequence with regard to compliance with the constitutional requirements pertaining to the fair-share fee information which must be provided fee payors.

It is also apparent there is not and cannot be any constitutional requirement that the information initially provided to fee payors contain an auditor's statement as to the amounts of union expenditures which are related to collective bargaining. As the court in *Andrews v. Education Association* (2d Cir. 1987), 829 F.2d 335, 127 L.R.R.M. 2929, observed, the usual function of an auditor is to ensure expenditures which a union claims it made for certain activities were actually made for those activities. Adoption of petitioners' position with respect to this matter would require auditors to make legal determinations as to which expenditures are chargeable and nonchargeable, in addition to performing the traditional duties of auditors. Although two sixth circuit decisions seem to require an auditor's verification as to which expenditures fall into the chargeable and nonchargeable categories (*e.g.*, *Damiano v. Matish* (6th Cir. 1987), 830 F.2d 1363, 126 L.R.R.M. 2727; *Tierney v. City of Toledo* (6th Cir. 1987), 824 F.2d 1497, 125 L.R.R.M. 3217), due regard for the traditional functions of an auditor does not support such a rule, and we decline to follow these decisions to the extent they suggest such a result. We note parenthetically a United States District Court of the Sixth Circuit has declined to interpret *Damiano* and *Tierney* as requiring an auditor to make an initial determination as to whether various union expenditures are chargeable to nonmembers. See, *e.g.*, *Lowary v. Lexington Board of Education* (N.D. Ohio March 2, 1988), No. C86–1536A, 130 L.R.R.M. 2611.

## II. IELRB ADJUDICATION PROCESS

### A. CONSOLIDATION OF CASES

All of the petitioners in this case, except the petitioners employed by the Alton School District (Alton petitioners), filed objections to the amounts of their representation fees before the IELRB hearing began. After the conclusion of the hearing, the Alton petitioners approached the attorney for the original petitioners and requested he also represent them. The attorney for the original petitioners acceded to this request. The Alton petitioners opposed being consolidated into the case involving the other petitioners, since they had had no opportunity to be heard before the IELRB. Acting on the unions' request, the IELRB nevertheless consolidated the objections of the Alton petitioners with those of the other petitioners.

The Alton petitioners argue this procedure unconstitutionally deprived them of a hearing prior to a deprivation of their property. They also point out the IELRB was not presented with any evidence whatsoever concerning the collective-bargaining expenses of the Alton Education Association, to which the Alton petitioners are required by the IELRB's order to pay fair-share fees. They also state all of the original objectors in this proceeding were teachers, but included among the Alton petitioners are several nonteaching school employees. The Alton petitioners assert that at the IELRB hearing, petitioners' attorneys did not direct any inquiries to bargaining expenses incurred on behalf of school employees who are not teachers. The Alton petitioners contend unless they are afforded a hearing as to appropriate amounts of their fair-share fees, all such fees previously deducted from their salaries should be returned and no fees should be deducted in the future.

The IELRB asserts the objections of the "Alton petitioners" were properly consolidated with those of the other petitioners because the IELRB's determination of the proper amounts of the fair-share fees of the NEA and the IEA is applicable to all the petitioners. The IELRB contends failure to consolidate the objections involved in this case could possibly have necessitated the holding of basically the same evidentiary hearing in 200 (the approximate number of educational labor bargaining units in Illinois in which labor contracts containing "fair-share" clauses exist) separate locations with a consequent waste of time, money, and resources of both the IELRB and the parties.

The unions assert the IELRB properly exercised its discretion in consolidating the objections of the Alton petitioners with those of the other petitioners because at the time of the consolidation, all issues

had been vigorously contested by the original parties who were represented by the same counsel as the Alton petitioners. Also, the unions assert because fair-share fee objections may be filed throughout the year, the procedure suggested by the Alton petitioners would burden the IELRB with repetitive litigation.

■■ As the petitioners point out, except in exigent circumstances, due process requires minimal procedural safeguards, including an explanation of reasons and a hearing, before one may be deprived of property or a property interest. (See *Fuentes v. Shevin* (1972), 407 U.S. 67, 88, 32 L. Ed. 2d 556, 574, 92 S. Ct. 1983, 1998; *Goldberg v. Kelly* (1970), 397 U.S. 254, 266-67, 25 L. Ed. 2d 287, 298-99, 90 S. Ct. 1011, 1020; *Sniadach v. Family Finance Corp.* (1969), 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820.) In class actions, due process requirements applicable to members of the plaintiff class include an opportunity to be heard and to participate in the litigation, an opportunity to "opt out" of the litigation, and adequate representation of the interests of absent class members. *Phillips Petroleum Co. v. Shutts* (1985), 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965.

■■ ■ The present litigation involves a consolidation of cases which each of the petitioners initiated by filing a fair-share fee objection. No attempt was made to join individuals who took no affirmative steps whatsoever to involve themselves in the litigation. Thus, the present case does not fall within the definition of a class action, and the *Phillips Petroleum* decision is not by its terms fully applicable to the Alton petitioners. However, when an attempt is made to accord binding effect to proceedings at a previously concluded hearing with respect to a party which had no opportunity to participate in the hearing, we deem the action to be sufficiently analogous to a class action, that the requirement of *Phillips Petroleum*, that members of the plaintiff class be accorded an opportunity to be heard and participate in the litigation, applies. Since the Alton petitioners admittedly did not have an opportunity to participate in the IELRB hearing which preceded the IELRB's determination of the amount of their fair-share fees, we must hold the collection of fair-share fees from the Alton petitioners under these circumstances violates their rights to due process of law.

If the unions are to collect fair-share fees from the Alton petitioners for the 1985-86 and 1986-87 school years, those individuals must be afforded hearing as to the amount of their fees. This hearing, however, need not be as complex as the previous hearing in this cause. For example, the unions may simply introduce as evidence the transcripts of the hearing in this cause (as well as evidence concerning the

expenditures of the Alton Education Association), and the IELRB may take notice of the evidence introduced at the previous hearing, provided thereafter the Alton petitioners are afforded an opportunity to present additional evidence.

The decision of the IELRB is reversed insofar as it requires the Alton petitioners to pay fair-share fees for the 1985-86 and 1986-87 school years. Within 30 days of the filing of this court's mandate in this cause, the IELRB is to set a date for a hearing on the objections of the Alton petitioners to their fair-share fees for the school years here at issue. Thereafter, the IELRB is to conduct such further proceedings with respect to those objections as it may deem appropriate.

### B. TIME AND PLACE OF HEARING

The hearing on petitioners' fair-share fee objections was held on 24 different days between October 20, 1986, and April 14, 1987. The hearing sessions were held on alternate dates in Chicago and Springfield. The petitioners assert that, contrary to the requirements of *Hudson*, the hearing procedure utilized in this case did not minimize the burden on them. They contend their fee objections should have been considered at short hearings held close to where they taught, at which the unions should have demonstrated what they spent on collective bargaining and contract administration. The petitioners imply the procedures utilized in this case were primarily designed to meet the convenience of the IELRB and the unions.

As the petitioners note, *Hudson* stands for the proposition the burden of objecting which is placed on payors of fair-share fees must be minimized. Hearings held closer to the residences of the objectors undoubtedly would have been more convenient for them on the dates when it was necessary for them to testify as witnesses at the hearings. But the great majority of the evidence at the hearing in this cause consisted of testimony of various union officials. Also, it was not necessary for all of the petitioners to be present at all of the hearing sessions, and the petitioners do not argue they desired to be personally present at all of the hearing sessions. Although the IELRB may have taken measures which would have imposed a lesser burden on petitioners than did the procedures which it utilized in this case, we cannot say reversal of the IELRB's order is required as a sanction for the manner in which it conducted these proceedings.

### C. PROMPTNESS OF DECISION

The *Hudson* Court held objecting payors of fair-share fees are entitled to "a reasonably prompt decision by an impartial decision-

maker" (*Hudson*, 475 U.S. at 307, 89 L. Ed. 2d at 247, 106 S. Ct. at 1076) or, stated differently, "a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker" (*Hudson*, 475 U.S. at 310, 89 L. Ed. 2d at 249, 106 S. Ct. at 1078). The *Hudson* decision was filed on March 4, 1986.

On April 10, 1986, the IEA sent its first mailing to nonmember fee payors in an effort to comply with *Hudson*. On August 21, 1986, the IEA sent nonmember fee payors a second mailing dealing with their rights under *Hudson* with regard to fair-share fees for the 1986-87 school year. The NEA's fiscal year ended on August 31, 1986.

On September 4, 1986, the IELRB consolidated all outstanding fair-share fee objections. The hearing on outstanding fair-share fee objections began on October 20, 1986. Prior to the commencement of the hearing, counsel for petitioners agreed it would be best to hold the hearing at the conclusion of the NEA's fiscal year. The last of 24 sessions of the hearing was held on April 14, 1987. Thereafter, on May 1, 1987, the hearing officer issued an order which found there were no issues of determinative fact and removed the case to the IELRB for decision. (80 Ill. Adm. Code §1120.40(f) (1985).) Post-hearing briefs were subsequently filed, and oral arguments were held before the IELRB on November 24, 1987. The IELRB issued its decision on April 8, 1988.

In its April 8, 1988, order, the IELRB stated its decision was issued as promptly as could be expected under the circumstances of this case. The IELRB stated because it relied on evidence of expenditures during the 1985-86 school years in determining the fair-share fees for 1986-87, the hearing could not have commenced until after the close of the IEA's and NEA's 1985-86 fiscal years. The IELRB further stated:

> "This procedure has been lengthy and time-consuming due to the novelty, complexity and proliferation of the issues in the present matter, and to the need to satisfy the objectors' repeated demands for a formalized and detailed process. The objectors have therefore not been deprived of any federal constitutional rights."

The IELRB also held the timeliness of any procedure can only be assessed by "the number of issues, their complexity and novelty, the number of parties, size of the record and the actions of the parties involved." As an additional basis for holding its decision was rendered in a "reasonably prompt" manner, the IELRB stated the burden on the objectors was minimized by the unions' voluntary advance reduction of the fair-share fees upon the filing of objections.

Petitioners argue under no construction of the term were they afforded a "reasonably prompt" hearing on their objections, as required by *Hudson*. They observe petitioner Antry filed his initial objection to his fair-share fees on September 30, 1985, the hearing on the petitioners' objections did not commence until more than one year after that date, and two years and seven months elapsed between the time Antry filed his objection and the date the IELRB entered its decision. The petitioners contend the IELRB's consolidation of all pending fair-share fee objections into one case, at the insistence of the unions and over the objection of petitioners, directly affected the novelty and complexity of this case and the size of the record. The petitioners further argue the unions' voluntary reduction of the amount of the fair-share fees upon objection of nonmembers did not ameliorate the IELRB's purported violation of the requirements of the *Hudson* decision in not providing them with a reasonably prompt hearing, since *all three* of the major procedural requirements imposed by *Hudson* must be complied with in each fair-share fee objection case. The petitioners imply that when it became apparent their objections would not be resolved within a reasonable amount of time, their contested fees being held in escrow should have been returned to them.

The IELRB asserts that in establishing a requirement for a "reasonably prompt" decision, the *Hudson* Court was concerned with objection adjudication processes which are entirely controlled by unions and which lend themselves to potentially self-serving and deliberate delays. The IELRB argues this clearly was not the scenario in the present case.

The unions observe that prior to the release of the *Hudson* decision, neither the IELRB nor the unions could have reasonably expected that prompt scheduling of hearings on fair-share fee objections is constitutionally required. The unions state immediately after the *Hudson* decision was released, both they and the IELRB took steps to comply with the new requirements for fair-share fee objection proceedings. The unions assert considering this was the IELRB's first case in an extremely complex and unsettled area of the law and *Hudson* injected many new issues into fair-share fee proceedings, it is quite understandable that 18 months elapsed between the time the hearings commenced and the time the IELRB issued its decision.

The unions also maintain the consolidation of all fair-share fee objections expedited rather than delayed resolution of the objections for, absent consolidation, individual hearings on more than 50 separate objections would have been necessary. The unions finally state that to penalize them by holding they are not entitled to fair-share fees for

the school years here at issue simply because the IELRB took a comparatively long period of time to decide this case, would unduly interfere with the unions' right to collect fair-share fees from objecting nonmembers.

We hold that when all relevant circumstances are considered, the IELRB's delay in adjudicating petitioners' objections did not violate *Hudson's* requirement of a reasonably prompt decision. It is noteworthy, in articulating the prompt decision requirement, the *Hudson* Court used the term "reasonably" to modify "prompt." In doing this, the Court indicated in determining whether decisions are prompt, the decision maker should not be held to a strict time frame, but instead all pertinent circumstances should be considered.

As the unions assert, delays which occurred before the *Hudson* decision was released should not be considered in assessing the promptness of the IELRB's decision, since prior to that time the unions and the IELRB could not have known that, as a matter of constitutional law, they were obligated to decide petitioners' objections in a reasonably prompt manner. Almost immediately after the *Hudson* decision was released, the unions took steps to notify fair-share fee payors of the procedures applicable to fee objections for the 1985-86 school year. The hearings on petitioners' objections commenced in October 1986, less than two months after the close of the NEA's fiscal year. The scheduling problems inherent in conducting a proceeding involving teachers and other witnesses from many different parts of the State, as well as witnesses who are residents of other States, provide an adequate explanation for the IELRB holding the hearings over a seven-month period. A delay in the proceedings from April until November 1987 for purposes of briefing was not unreasonable, especially when the time needed to prepare the transcript of the hearing is considered. In a case such as this involving many issues of first impression, the filing of the IELRB's decision approximately five months after oral argument—in April 1988—also did not represent an unreasonable delay. *Cf. Kuehn v. American Federation of State, County & Municipal Employees, Council No. 65* (Minn. App. 1989), 435 N.W.2d 130, 135.

As the unions note, the petitioners repeatedly requested, and still appear to insist, that at the hearing on their fair-share fee objections every NEA and IEA employee should have been required to provide detailed testimony concerning his or her activities during the 1985-86 school year. This obviously would have resulted in an even greater delay in the IELRB's decision than that which actually occurred. In view of the petitioners' position as to the manner in which

the IELRB hearing should have been conducted, it seems rather incongruous for them to complain they were not provided with a reasonably prompt decision.

 Contrary to petitioners' contentions, it is unlikely consolidation of these cases significantly delayed the IELRB's decision for most of the petitioners. Given the IELRB's limited resources, decisions in at least some of the individual cases would probably have been delayed to the same extent as the IELRB's decision in the present case.

The petitioners cite several decisions in support of their assertion delays of up to 12 months in adjudicating fair-share fee objections are not permissible. (*Damiano v. Matish* (6th Cir. 1987), 830 F.2d 1363, 126 L.R.R.M. 2727; *Tierney v. City of Toledo* (6th Cir. 1987), 824 F.2d 1497, 125 L.R.R.M. 3217; *McGlumphy v. Fraternal Order of Police* (N.D. Ohio 1986), 633 F. Supp. 1074; *Hagen v. Illinois Education Association* (C.D. Ill. Sept. 13, 1985), No. 84—1313 (unpublished).) As the unions point out, however, the first three of these cases dealt with procedures which had built-in delays, which precluded resolution of fee objections before a certain time period elapsed. (*Hagen* predated *Hudson* and is thus of no relevance to *Hudson's* prompt-decision requirement.) In the present case, by contrast, the procedures do not assure delays in resolution of fair-share fee objections of the kind which the petitioners experienced. As resolution of fair-share fee objections in conformity with the requirements of *Hudson* becomes a more routine matter, the objections undoubtedly will be adjudicated in a much more expeditious manner than occurred in the present case.

### III. DETERMINATION OF AMOUNTS TO BE ESCROWED

The petitioners assert that, contrary to constitutional requirements, the unions merely guessed at the amounts to be deducted from the salaries of nonmembers as fair-share fees and placed in escrow pending resolution of the objections to the fees. The bases for this contention are (1) the amounts deducted were not premised on careful calculations by the unions, subject to audit, of which of the unions' expenditures fell within the chargeable and nonchargeable categories; (2) just as the hearing before the IELRB was about to get under way, "the unions were still scrabbling about trying to determine how their employees spent their time for the year in question"; (3) the IEA's conclusions as to what portions of its expenditures were chargeable to nonmembers were based on the *Dolan v. Rockford School District No. 205* (N.D. Ill. Aug. 19, 1985, No. 84—C—2029), decision and the IEA's

representation fee umpire report, both of which dealt with information which was two to three years old; and (4) the NEA's determinations of its chargeable expenditures were based on a representation fee umpire report which dealt with two-year-old information. The petitioners assert the escrowing of their fair-share fees did not cure the errors in the calculation of the fair-share fees withheld from their pay.

The unions contend the representation fee umpire reports, on which they relied in determining the fair-share fees to be withheld from the objectors' salaries and escrowed, contained the most recent data as to union expenditures available at the time. The unions also assert the requirement of verification by an independent auditor of— (1) amounts withheld from objectors' salaries and escrowed and (2) the escrow figure itself—applies only if, upon the filing of objections, the unions choose to escrow less than the entire amount of the previously determined fair-share fees. The unions point out in this case, they escrowed the entire amount of the objectors' fair-share fees.

The IELRB did not specifically address this phase of petitioners' argument in its opinion and order.

■■ As noted by the unions, *Hudson* does not require an audit with regard to the amounts withheld from the salaries of nonmember objectors and placed in escrow pending a decision on the objections, so long as the entire amounts withheld are placed in escrow. A union is required to provide independent verification and an independent audit of the amount of fair-share fees escrowed only when it seeks to utilize a portion of the fair-share fees withheld from the salaries of objectors while their objections are pending. (*Hudson*, 475 U.S. at 310 n.23, 89 L. Ed. 2d at 249 n.23, 106 S. Ct. at 1078 n.23.) In this case, it is undisputed all amounts withheld from the petitioners' salaries as fair-share fees were escrowed pending resolution of the petitioners' objections. Thus, the failure of the unions to obtain audits and verification of the amounts withheld from the petitioners' salaries and escrowed did not violate any of the petitioners' constitutional rights.

■■■ The *Hudson* decision does state unions must provide an "appropriately justified advance reduction" of the fair-share fees of nonmembers. (*Hudson*, 475 U.S. at 309, 89 L. Ed. 2d at 249, 106 S. Ct. at 1077.) However, the reduction need only be in the amount "undisputably used for political or ideological functions." (*Damiano v. Matish* (6th Cir. 1987), 830 F.2d 1363, 1369, 126 L.R.R.M. 2727, 2732.) The unions' reliance on the representation fee umpire reports for preceding years was a good-faith effort to comply with this requirement. At the beginning of a school year, data concerning the amount spent on political and ideological activities in preceding years

is the most accurate data available concerning the amounts likely to be spent on such activities in the ensuing year, absent a projected dramatic shift in a union's spending patterns. In the present case, there is no evidence of such an alteration of any of the unions' spending patterns. Moreover, it is apparent that the term "appropriately justified," as used in the above-referenced portion of the *Hudson* opinion, relates only to the data which unions must initially provide to all fee payors. As we read the *Hudson* decision, it does not require unions to premise the amounts withheld from objectors' pay following the filing of objections on extremely detailed projections of union expenditures in the upcoming school year, absent a substantial shift in union spending patterns from previous years. None of the cases cited in support of this argument support a contrary conclusion. We hold the amounts deducted as fair-share fees from petitioners' salaries after receipt of their objections were not excessive and were adequately supported by the best information available to the unions at the time.

### IV. CALCULATION OF FAIR-SHARE FEES

#### A. STANDARD OF REVIEW

The petitioners assert that in reviewing the IELRB's findings of fact as to what union expenses are chargeable to nonmembers, the normal standard of review applicable to administrative agency decisions does not apply. Rather, they assert in cases such as this, which involve first amendment rights, courts must independently review the administrative agency's factual findings.

As noted by petitioners, the Supreme Court in *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949, a product disparagement action involving a "public figure" plaintiff, held that in determining whether actual malice is present in such cases, courts must independently review the evidence. The requirement of independent appellate review established in *Bose* has subsequently been applied in cases other than defamation actions where first amendment rights were at issue. (*E.g.*, *Don's Porta Signs, Inc. v. City of Clearwater* (11th Cir. 1987), 829 F.2d 1051 (city ordinance governing use of portable outdoor advertising signs).) Some decisions hold this standard of review applies only in situations where the trial court has rejected a first amendment claim. See *Daily Herald Co. v. Munro* (9th Cir. 1988), 838 F.2d 380; *Planned Parenthood Association/Chicago Area v. Chicago Transit Authority* (7th Cir. 1985), 767 F.2d 1225.

In most cases involving fair-share fees, including this one,

there is no factual dispute as to the amount of money actually spent on various union activities. Rather, the controversy concerns whether the various union activities are related to collective bargaining to the extent that nonmember fee payors may be required to support them. This is basically a question of law as opposed to a question of fact. Thus the principle that findings and conclusions of administrative agencies on questions of fact shall be held *prima facie* true and correct (Ill. Rev. Stat. 1987, ch. 110, par. 3—110) is inapplicable to this question. Instead, the rule that courts of review are not bound by an administrative agency's conclusions of law applies. (*B.F. Gump Co. v. Industrial Comm'n* (1952), 411 Ill. 196, 103 N.E.2d 504; *Danison v. Paley* (1976), 41 Ill. App. 3d 1033, 355 N.E.2d 230.) The latter standard of review is somewhat similar to that prescribed by the *Bose* Court, except under the *Bose* rule, courts of review cannot defer to the conclusions of the trier of fact as to legal questions, even if they would be inclined to do so.

In this case, we must decide whether the IELRB's decision requires petitioners to support union activities unrelated to collective bargaining in violation of their first amendment right to freedom of association for the advancement of ideas. This right is entitled to no less protection than other first amendment rights. Also, petitioners assert the IELRB denied, in part, their first amendment claim that they are being compelled to financially support union activities unrelated to collective bargaining. For these reasons, in reviewing the IELRB's fair-share fee calculations, we will accord no deference to the IELRB's findings and conclusions.

B. RELATIONSHIP BETWEEN FAIR-SHARE FEES AND SERVICES PROVIDED BY STATE AND NATIONAL PARENT UNIONS TO LOCAL UNIONS

The petitioners contend that since only their local unions are their exclusive bargaining representatives, they should not be required to pay fair-share fees to the IEA and to the NEA. Alternatively, the petitioners argue the IELRB should have charged them only with the costs of the collective-bargaining-related activities of the NEA and the IEA which directly benefitted or assisted the petitioners' local unions. (This method of calculating the fair-share fees of State and national labor organizations is known as the "cost-pool" analysis.) The petitioners contend the system of allocating NEA and IEA collective-bargaining-related expenditures approved by the IELRB—under which employees included in all local bargaining units must pay a proportionate share of the IEA and NEA dues charged members of local unions, regardless of the amount of collective-bargaining-related services

which the State and national organizations provide to the locals—in effect requires petitioners to subsidize the dues of union members who for various reasons are allowed to pay reduced amounts of dues, and the dues of union members in the 75% to 80% of the bargaining units affiliated with the IEA in which there are no fair-share fee requirements. The petitioners state there is little evidence concerning the services which the NEA and the IEA provided to the locals to which they are required to pay fair-share fees and assert the failure of the unions to provide such evidence impermissibly placed the burden of proof on petitioners.

In its decision, the IELRB noted the petitioners' argument for a "cost-pool" analysis of chargeable expenses has been rejected by virtually every court which has considered it. (*E.g.*, *Lehnert v. Ferris Faculty Association* (W.D. Mich. 1986), 643 F. Supp. 1306, 123 L.R.R.M. 2361; *Kilpatrick v. Board of Education* (1988), 206 Conn. 25, 535 A.2d 1311; *Abels v. Monroe County Education Association* (Ind. App. 1986), 489 N.E.2d 533, 123 L.R.R.M. 3006, *cert. denied* (1987), 480 U.S. 905, 94 L. Ed. 2d 518, 107 S. Ct. 1347; *New Prairie Classroom Teachers Association v. Stewart* (Ind. App. 1986), 487 N.E.2d 1324, 123 L.R.R.M. 3115, *cert. denied* (1987), 480 U.S. 917, 94 L. Ed. 2d 686, 107 S. Ct. 1370.) The IELRB further held a requirement that chargeable expenditures be calculated in this manner would impose an unnecessary accounting burden on the unions. The IELRB also stated the present method of calculating fair-share fees does not require individuals such as petitioners to bear a disproportionate share of collective-bargaining and contract administration expenses, since collective-bargaining activities of non-fair-share bargaining units affect members of fair-share bargaining units, and differences in union dues charged different classes of union members reflect variations in the economic benefits which different categories of members obtain as a result of union activities.

On appeal, the IELRB notes it found the NEA and the IEA, as affiliates of the local unions, were exclusive bargaining representatives of the petitioners to the same extent as were the local unions. Furthermore, the IELRB observes the record is replete with evidence the NEA and IEA rendered numerous and valuable services to the local unions, which in fact assisted the locals in fulfilling their duties as exclusive bargaining representatives. The IELRB asserts adoption of petitioners' position as to this issue would severely restrict the ability of local unions to provide essential services for their members.

The unions assert nonmembers who are employed in bargaining units should be required to pay the proportion of IEA and NEA dues

which represent expenditures related to collective bargaining because members of local unions affiliated with the IEA and NEA are also required to become members of the two parent unions. Thus, argue the unions, IEA and NEA dues are among the dues "uniformly required of members" specified in section 11 of the Illinois Educational Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, par. 1711). Therefore, nonmembers of educational employees' unions included in bargaining units having fair-share contract clauses must pay appropriate percentages of the NEA.and IEA dues, as well as appropriate percentages of the dues of the local unions, as fair-share fees. The unions further maintain a breakdown bargaining unit by bargaining unit, of IEA and NEA expenditures, is neither statutorily nor constitutionally required in determining the chargeability of these expenditures to fee payors.

We find extended discussion of this issue unnecessary and hold, in conformity with the virtually unanimous decisions of courts which have considered the issue, petitioners' proposed method of fair-share fee calculation is untenable. Parent unions such as the IEA and NEA provide a vast array of services to their affiliated local unions. These include the services of lawyers, negotiators, economists, and research staff. Under arrangements such as those existing between the IEA and the NEA and the local unions, the cost of these services is evenly spread among all who benefit from them. Requiring local unions to forego this arrangement and provide for these services on their own could quickly cause the cost of collective bargaining by the locals to become prohibitive. For this reason, local unions should have the option of (1) paying fees to their State and national affiliate unions in order to assure the continuous availability of these organizations' services, and (2) compelling all who benefit from their collective-bargaining activities to pay their fair share of the cost of having these services continuously available. See, e.g., Abels, 489 N.E.2d 533, 123 L.R.R.M. 3006.

Additionally, as noted in Lehnert (643 F. Supp. 1306, 123 L.R.R.M. 2361), a requirement of a bargaining-unit-by-bargaining-unit breakdown of amounts expended by State and national unions would impose an unreasonable administrative and financial burden on the unions. This burden would perhaps make it uneconomical for the parent unions to continue collecting fair-share fees and thus also deprive them of their right to reimbursement for services provided to nonmembers.

Petitioners' argument concerning subsidization of the IEA and NEA dues of various classes of union members by fee payors also does not support a bargaining-unit-by-bargaining-unit breakdown of

IEA and NEA expenditures. The reduced rates of dues which some union members pay are usually related to the fact these persons derive a lesser amount of economic benefit from union activities than do others. Normally, for instance, the incomes of such individuals are considerably less than those of individuals who pay the full amount of dues. To the extent the lesser dues of such individuals reflect fewer economic benefits accruing to them, neither fee payors nor anyone else subsidizes their dues. Also, the refusal of certain school districts to cause fair-share clauses to be inserted in their contracts with educational labor unions does not provide a basis for holding fee payors in districts having such contract clauses should not pay their fair shares of IEA and NEA expenditures related to collective bargaining. Adoption of this phase of petitioners' argument would require fair-share clauses in all educational labor contracts in the State before any fair-share clause could be enforced with respect to IEA and NEA dues.

Since we conclude petitioners' proposed method of fair-share fee calculation is without merit, the unions were under no duty to introduce evidence which would have enabled the petitioners to determine the costs that the NEA and the IEA incurred with respect to specific local unions.

### C. FORMULA FOR CALCULATION OF FAIR-SHARE FEES

Relying on the fact that NEA dues are based on a percentage of the average nationwide salary of the classroom teacher, the petitioners assert the fair-share fees at issue were established on a purely arbitrary basis having little to do with each employee's *pro rata* share of chargeable union expenditures. They assert fair-share fees should be determined by adding up all chargeable expenses and dividing them by the number of employees in a bargaining unit.

The IELRB held, and argues on appeal, that where virtually all of the revenue of an exclusive bargaining representative is derived from fair-share fees and dues, its fair-share fee should be determined by multiplying the percentage of union expenditures chargeable to fee payors by the dues uniformly required of its members.

The unions note an extensive body of precedent supports the method of fair-share fee calculation adopted by the IELRB and state use of this method is proper where, as here, practically all union income is derived from fair-share fees and dues.

■■ Virtually all of the courts which have considered this question have approved of the formula for calculating fair-share fees adopted by the IELRB in the present case. (*E.g., International Asso-*

*ciation of Machinists v. Street* (1961), 367 U.S. 740, 774-75, 6 L. Ed. 2d 1141, 1164-65, 81 S. Ct. 1784, 1803; *Abels*, 489 N.E.2d 533, 123 L.R.R.M. 3006.) Moreover, precisely determining the chargeable expenses of the IEA and the NEA on a bargaining-unit-by-bargaining-unit basis so they could be divided by the number of members of each bargaining unit, as would be required under the formula petitioners advance, would create much the same problems which have caused this court and other courts to reject the "cost-pool" method of determining the amounts of these expenditures which are chargeable to fee payors.

The IELRB utilized the proper formula in calculating petitioners' fair-share fees. To the extent *In re Dailey & Woburn Teacher's Association* (1987), 13 Mass. Lab. Cases 1555, upon which petitioners rely, supports a contrary conclusion, we decline to follow that decision.

### D. PRESUMPTION OF CHARGEABILITY TO FEE PAYORS OF VARIOUS UNION EXPENDITURES

The petitioners assert in determining various union expenditures were chargeable to fee payors, the IELRB impermissibly relied on a presumption that expenditures inherently related to collective bargaining are chargeable. The petitioners contend employing a presumption of chargeability with regard to any union expenses violates the requirement that unions bear the burden of establishing the legitimacy of their claimed fair-share fees.

The IELRB notes it required "sufficiently specific" proof of the chargeability of expenditures to nonmembers when the expenditures in question were not inherently related to collective bargaining. Furthermore, the IELRB observes it only mentioned a presumption of chargeability with respect to expenditures for the NEA's bargaining- and negotiations-support programs.

As the unions point out, a Massachusetts case, *School Committee v. Greenfield Education Association* (1982), 385 Mass. 70, 76-77 n.3, 431 N.E.2d 180, 185 n.3, 109 L.R.R.M. 2420, 2423-24 n.3, does hold the use of presumptions of chargeability of union expenditures would probably run afoul of the requirement that unions bear the burden of proving their entitlement to fair-share fees. In *Hudson*, however, the Court stated: "If, for example, the original disclosure by the Union had included a certified public accountant's verified breakdown of expenditures, including some *categories that no dissenter could reasonably challenge*, there would be no reason to escrow the portion of the nonmember's fees that would be represented by those categories." (Emphasis added.) (*Hudson*, 475 U.S. at 310, 89 L. Ed.

2d at 249, 106 S. Ct. at 1077-78.) This statement implies a presumption of chargeability as to union expenditures for activities clearly related to collective bargaining is not inconsistent with the constitutional requirements for determination of fair-share fees, provided audits establish the amounts expended for each union activity.

In its order, the IELRB accepted a determination by the NEA, that expenditures for its bargaining- and negotiations-support programs are chargeable, except for expenditures for illegal job actions and interest-free loans in crisis situations. In reaching this conclusion, the IELRB stated, "NEA programs for bargaining and negotiations assist NEA affiliates in providing services which are central to their role in representing employees and are presumptively permissible." Nowhere else in its order does the IELRB refer to a presumption of chargeability.

The expenses of collective bargaining and contract negotiations unquestionably are within the chargeable category. (*E.g.*, *Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782.) It follows that activities designed to assist local unions in improving their skills in these limited areas are also chargeable. Since the petitioners presented no evidence which established the NEA bargaining- and negotiations-support programs included activities which are not chargeable (other than illegal job actions and interest-free loans in crisis situations), the IELRB did not err in presuming the expenditures for these programs are chargeable.

E. ADMISSIBILITY OF SURVEY RESULTS AND TIME SHEET SUMMARIES, AND QUALITY OF THE UNIONS' EVIDENCE.

In determining the chargeable percentages of its expenditures, the NEA divided its total annual expenditures of approximately $100 million into eight program areas (*e.g.*, affiliate services, communications, research) and four support areas (*e.g.*, business services, data processing). Each program area was then divided into functions. For instance, the affiliate services area was divided into the functions of membership promotion and recruitment; coordination of services to affiliates; bargaining and crisis support; political, legislative and education issue support; organizational maintenance; and "Uniserv." Each function was then divided into programs. The organizational maintenance function of the affiliate services program area was, for example, divided into the following programs:

"Program 7.1
Organize, strengthen, and/or secure representation rights in up to 20 urban affiliates.

Program 7.2

Secure exclusive recognition for local affiliates where a competing organization is the recognized representative.

Program 7.3

Assist local affiliates in overcoming challenges to their representation rights. Provide shared staffing as requested.

Program 7.4

Assist state and local affiliates in planning and implementing projects to organize and recruit Educational Support Personnel [ESP] members. Provide staff support in conducting a national ESP conference. Provide staff support to the Committee on Educational Support Personnel.

Program 7.5

Develop and implement a multifaceted program focused on Higher Education. Organize and secure exclusive recognition in up to 20 new higher education units. Provide staff support in conducting a national Higher Education Conference. Initiate a national faculty pension rights project. Provide staff support to the Committee on Higher Education."

Each NEA employee must record his or her daily activities on a form entitled "Employee Daily Activity Report." All work which employees perform must be keyed to a specific six-digit cost-center code. For purposes of assigning cost-center codes to each program, programs were sometimes further divided according to the area of the country in which the activity took place or to which it was directed. Also, programs were sometimes further subdivided on the basis of specific functional activities within each program. For instance, program 7.2 of the organizational maintenance function of the affiliate services area was subdivided into the categories of "Take-Over Field Office" (which was further subdivided into activities directed to the various regions of the country), "Headquarters K-12 Organizing," and "Take-Over Projects." Travel expenses and accounts payable were similarly keyed to specific cost-center codes. This data was then used to develop the NEA's budget and the NEA's program accomplishment report, which together summarized both the expenditures and the activities of the NEA for the entire school year.

The actual calculation of chargeable expenditures was supervised by Mitchell Roth, an NEA staff attorney, who has been in charge of this aspect of the NEA's fair-share procedures for more than six years. To begin the process, Roth sent a memorandum to key NEA administrators, primarily persons serving as directors of program areas, shortly before the end of the 1985-86 school year. The memo-

randa asked each administrator to prepare an analysis of the chargeability of all expenditures in his or her program area, as separated by function and program. Attached to the memoranda were general guidelines for determining the chargeability of expenditures, which Roth had prepared based on applicable legal standards. For example, the memoranda included activities related to "collective bargaining," "contract administration," "grievance adjustment," and "specific terms and conditions of employment" among chargeable expenditures and listed activities such as "voter registration," "support for charitable, religious, or ideological causes," and "organizing new members" as nonchargeable activities. Additionally, Roth included in the memoranda specific guidelines tailored to the activities of each of the NEA's areas of operations. Finally, Roth instructed each administrator to err on the side of nonchargeability: if there was any question whether a particular expenditure was chargeable, the item was to be categorized as nonchargeable.

During the ensuing months, Roth supervised the determination of chargeable expenditures, discussed certain activities with the relevant administrators, and reviewed much of the documentation on which the administrators relied in computing their chargeable expenditures. Eventually, each of the administrators prepared a written response to the Roth memoranda, the results of which formed the basis for the NEA's claims of chargeable expenditures.

In order to prepare their responses to the Roth memoranda, the NEA administrators reviewed time sheets, vouchers, and other relevant documents maintained in the regular course of the NEA's business, and made column inch counts in order to determine the percentages of the various NEA publications devoted to chargeable activities. In addition, they often consulted with various employees assigned to their areas of operations. The administrators were also provided with financial reports and otherwise assisted by the NEA's accounting staff.

The chief means by which the IEA determined its percentages of chargeable expenditures for the time periods here at issue was surveys of its employees. The surveys were circulated to 75 key management personnel and staff members in September 1986. The surveys identified 10 categories of activities, both chargeable and nonchargeable, in which IEA personnel engage.

The survey recipients were requested to review their 1985-86 correspondence files, to discuss their prior year's activities with their secretaries, and to review their appointment books, calendars, travel vouchers, and other available business documents. After doing this,

the recipients completed the survey by allocating their time worked among the 10 categories of activities contained within the survey, signed the survey, and returned it to Clayton Marquardt, the IEA's deputy executive director and director of membership services. The survey recipients were informed if they had any doubt whether a particular activity should be included in a chargeable or nonchargeable category, they should err on the side of including it under nonchargeable activities. For accounting purposes, the expenditures of the IEA are allocated into various "decision packages," which consist of expenditures related to the same department or activity.

The petitioners assert that in determining the chargeable percentages of NEA expenditures, the IELRB primarily relied on double hearsay. The petitioners state the documents on which the NEA's chargeability calculations were premised—employee time sheets and column inch counts of information concerning chargeable activities in NEA publications—were not admitted into evidence. The petitioners also suggest they were prejudiced by not being able to cross-examine NEA employees who convinced their superiors to include some of their activities in the chargeable category.

The petitioners point out in some instances Mitchell Roth, the NEA attorney who testified concerning the chargeable percentages of most NEA expenditures, could not state on the basis of personal knowledge and on the basis of the time sheets of various NEA employees whether particular programs or activities were chargeable. The petitioners note Roth did not even know what some NEA programs—such as the Center for Democratic Renewal—were. The petitioners argue the deficiencies in Roth's testimony and the NEA's failure to present the testimony of any NEA employees with firsthand knowledge of various NEA activities (1) prevented petitioners from effectively cross-examining the NEA's witnesses and rebutting the NEA's generalized claims of chargeability, and (2) violated the principle that hearsay cannot form the basis for administrative decision-making.

Also, the petitioners assert NEA employees kept no contemporaneous time sheets which were "keyed *** into chargeable/nonchargeable categories," and the few contemporaneous records of NEA activities which the objectors introduced as rebuttal evidence contained insufficient information as to the chargeability of the various NEA activities described therein to be a reliable basis for the NEA's chargeability claims.

With respect to the IEA's evidence, petitioners assert there are several fatal defects in the employee surveys on which the IELRB re-

lied in reaching its decision: (1) only 75 of 170 IEA employees were surveyed; (2) the IEA prepared its employee survey form in a lax and indifferent manner and did not make use of expertise available to it in designing the survey; (3) the evidence concerning the results of the survey involved three levels of hearsay: (a) the individual employees' review of their correspondence and calendars and conversations with their secretaries in order to determine their activities during the relevant time period, (b) the statements of employees on the survey forms which they completed, and (c) the testimony of Clayton Marquardt concerning the survey results; and (4) the testimony of the few IEA employees who testified revealed the results of the surveys were inherently unreliable.

In support of the last of the above contentions, the petitioners assert in instances where IEA employees were cross-examined as to the contents of their surveys, the unions' claims as to the chargeability of the employees' activities were almost always rejected by the IELRB, because of the unreliability of the employees' judgments as to the time they spent on various activities. The petitioners contend, on the other hand, when they were purportedly denied the right to cross-examine IEA employees because the employees did not testify at the IELRB hearing, the unsworn time estimates contained in the surveys completed by those employees were accepted as a reliable means of determining whether their activities were chargeable. The petitioners assert, in essence, the IELRB rejected sworn testimony as to the percentages of employee time spent on chargeable activities but accepted unsworn hearsay testimony as to this same subject. Also, petitioners assert admission of hearsay evidence violated their rights to due process of law by depriving them of an opportunity to test the accuracy of the statements contained therein through cross-examination, and assert hearsay evidence should generally be deemed inadmissible in cases where first amendment rights are at stake.

The petitioners further assert the IELRB rounded some employees' estimates of their time spent on chargeable activities to 75% if the employee estimated he or she spent at least 75% of his or her time on chargeable activities and to 50% if the employee estimated the portion of his or her time spent on chargeable activities equaled or exceeded 50% but was less than 75%. The petitioners assert this procedure demonstrates the IELRB felt the employee surveys could not be accepted at face value.

In its argument on appeal, the IELRB states the employees of unions are not the proper parties to initially categorize expenses as chargeable or nonchargeable, as this requires a legal analysis. The

IELRB argues the type of strict scrutiny of union records and the right to extensively cross-examine all union employees for which petitioners seem to argue is not required by relevant court decisions and would have resulted in a gigantic and unmanageable record, in view of the large number of NEA financial documents and employee activity reports which are generated each year.

The IELRB asserts it has a rule permitting the introduction in IELRB proceedings of hearsay evidence which is material, relevant, and would be relied upon by reasonably prudent persons in the conduct of their affairs. (80 Ill. Adm. Code §1105.190 (Supp. 1986).) The IELRB also observes evidence concerning the results of surveys and questionnaires has been held admissible in a wide variety of administrative and judicial proceedings, the rules against the admission of hearsay evidence notwithstanding. The IELRB asserts the alternative to admission of the evidence of which the petitioners complain—the presentation of testimony by all of the unions' employees—would have greatly lengthened the hearing in this case. The IELRB further maintains any shortcomings in the surveys, the results of which were presented at the IELRB hearing, would go only to the weight to be accorded the survey results and not to their admissibility. The IELRB notes it examined each of the IEA survey forms admitted into evidence and on many occasions held the IEA could not charge for specific expenditures because of insufficient specificity in the information contained in the surveys.

The IELRB additionally points out in determining which IEA activities were chargeable, it gave reduced weight to the employee surveys where, based on factors such as the age of the survey or the varied activities of the employee who completed the survey, it deemed it appropriate.

The unions assert that in view of the fact that 30,000 time sheets were utilized in the NEA's calculations of chargeable expenditures and all of these were made available to petitioners, the introduction into evidence of those time sheets would have burdened the record and would have served no useful purpose. The unions also note three witnesses called by the NEA provided detailed testimony concerning NEA expenditures. The unions state although these witnesses may not have been familiar with a few specific NEA expenditures, their testimony, when considered as a whole, provided a complete and accurate picture of the NEA's expenditures.

With regard to the purported hearsay character of the evidence of NEA expenditures, the petitioners contend all that is necessary in a case such as this, where business records form the basis for the deci-

sion, is foundation testimony supporting the accuracy of the record-keeping system. The unions argue that in this case there was testimony of supervisory employees sufficient to explain the system under which the NEA calculated its chargeable expenditures.

As for the evidence concerning the IEA expenditures, the unions assert hearsay evidence is admissible in IELRB proceedings by virtue of both an IELRB rule (80 Ill. Adm. Code §1105.190 (Supp. 1986)) and judicial decisions. (*E.g.*, *National Labor Relations Board v. Remington Rand, Inc.* (2d Cir. 1938), 94 F.2d 862, 1—A L.R.R.M. 585, *cert. denied* (1938), 304 U.S. 576, 82 L. Ed. 1540, 58 S. Ct. 1046; *Starkey v. Illinois Civil Service Comm'n* (1982), 105 Ill. App. 3d 904, 435 N.E.2d 176, *rev'd on other grounds* (1983), 97 Ill. 2d 91, 454 N.E.2d 265.) The unions also state it would have been impractical and prohibitively expensive for each member of IEA's management and staff to testify before the IELRB. For these reasons, and because *Hudson* does not require absolute precision in the calculation of the amount of fair-share fees, the unions contend the IELRB properly relied on the IEA surveys in reaching its decision.

We hold the evidence of NEA and IEA expenditures consisting of summaries of employee time sheets, and employee surveys and column inch counts of publications and summaries thereof, was properly admitted. We further hold the IELRB properly relied on these materials in reaching its decision. These documents summarized a huge amount of information. Presentation of direct testimonial evidence concerning the facts summarized in these documents undoubtedly would have lengthened the administrative hearing in this case, further delayed the IELRB's decision, and resulted in a record on appeal even larger than the 5,300-page record which resulted from the IELRB proceedings in this case. This in turn would have thwarted the requirement of *Hudson* that objections to fair-share fees must be adjudicated in a reasonably prompt manner.

In *Richardson v. Perales* (1971), 402 U.S. 389, 28 L. Ed. 2d 842, 91 S. Ct. 1420, the Supreme Court recognized the need for relaxed evidentiary standards in situations where an administrative agency handles a large volume of cases and presentation of live testimony concerning matters covered by the documentary evidence would impose a significant additional burden on the agency. The *Perales* Court cited this factor, among others, as a basis for holding in cases involving social security disability claims, physicians' written reports of medical examinations of claimants may constitute evidence supportive of a finding of no disability. This holds true even if the claimant objects to the admissibility of the reports, and the only live testimony

contradicts the written reports.

■■■ As petitioners point out, the Illinois Supreme Court has held hearsay evidence is generally inadmissible in administrative proceedings. (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 475 N.E.2d 879; see also *Eastman v. Department of Public Aid* (1989), 178 Ill. App. 3d 993, 534 N.E.2d 458; *Kurdi v. Du Page County Housing Authority* (1987), 161 Ill. App. 3d 988, 514 N.E.2d 802.) Illinois courts have, however, recognized an exception to this general rule if evidence more reliable than hearsay evidence is not available and if the administrative tribunal's findings are supported by the type of evidence on which responsible persons are accustomed to rely in serious affairs. *Flex v. Department of Labor* (1984), 125 Ill. App. 3d 1021, 466 N.E.2d 1050; *Starkey v. Illinois Civil Service Comm'n* (1982), 105 Ill. App. 3d 904, 435 N.E.2d 176, *rev'd on other grounds* (1983), 97 Ill. 2d 91, 454 N.E.2d 265.

■■■ Considering the need for a reasonably prompt decision in fair-share fee cases, as well as the *Hudson* Court's observation that there are practical reasons why absolute precision in the calculation of fair-share fees is neither to be expected nor required, we conclude evidence relating to the unions' chargeable activities, other than the materials on which the IELRB relied in this case, was for practical purposes unavailable. Moreover, the materials on which the IELRB relied in reaching its decision are the kind of data on which responsible individuals normally rely in the conduct of serious affairs. The time sheets and summaries thereof are apparently used by the NEA for payroll purposes, and reliance is placed on survey results in many facets of daily life. The petitioners introduced absolutely no evidence employees of the unions were motivated to intentionally falsify, or actually did falsify, their time sheets or surveys.

■■■ In addition to being admissible under the principle governing admission of hearsay in administrative proceedings, the employee surveys were admissible under a recognized exception to the hearsay rule applicable to judicial proceedings. Surveys are generally deemed admissible provided certain requirements are met. These include adherence to generally accepted survey principles and utilization of the results in a statistically correct manner. Technical inadequacies in a survey are relevant only to the weight to be accorded it and not to its admissibility. (*Keith v. Volpe* (9th Cir. 1988), 858 F.2d 467; *Debra P. by Irene P. v. Turlington* (11th Cir. 1984), 730 F.2d 1405; *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.* (11th Cir. 1983), 716 F.2d 833; contra *Alabama Public Service Comm'n v. Purolator Courier Corp.* (Ala. 1988), 533 So. 2d 237 (implying surveys are not admissible under ex-

ception to hearsay rule unless they are attested to or affirmed under oath, and the persons who completed the surveys are actually present at the proceeding at which the surveys are admitted into evidence).) In this case, petitioners complained the survey of IEA employees was designed in a careless manner. However, the survey on its face provides employees with an adequate means of stating the percentages of their working hours which were devoted to various categories of chargeable and nonchargeable activities, and the petitioners presented no testimony of expert witnesses which established there were fundamental flaws in the survey methodology. Absent such evidence, there is no basis for holding the IEA employee survey was so inadequately designed that the IELRB erred in admitting the surveys and relying on the survey results.

The record does not support petitioners' argument that whenever testimony of the persons who completed surveys was introduced, their testimony was rejected, and their activities ruled nonchargeable, while the activities of employees who did not testify were generally held chargeable. Rather, the activities of some IEA employees who testified were held nonchargeable on the basis of the data contained in the surveys which they completed, rather than on the basis of their testimony. In other words, the IELRB almost certainly would have held the activities of those individuals were nonchargeable even if they had not testified.

The petitioners also contend since the calendars and correspondence files of a group of five IEA employees contained scant information as to how they spent their time, the surveys completed by these employees should be deemed unreliable. The IELRB found all of these employees devoted at least 50% of their time to chargeable activities. For this reason, the paucity of information on the calendars and in the correspondence files of these employees does not, in our view, negate the reliability of the surveys which they completed to the extent to which the IELRB relied on the surveys. If more than 50% of an employee's time is devoted to a single category of activity—as was the case with these five employees—the employee will usually know that fact without having to refer to a calendar or correspondence file. If petitioners had wished to attack the credibility of the statements of these employees as to how they spent their time, they could have done so by presenting evidence which contradicted their survey statements concerning this matter. Petitioners did not do this, and there are no indications persons who could have testified as to this matter were not available if petitioners had wished to call them as witnesses. The fact the IELRB rounded down the chargeable percentages of the activities

of some IEA employees to either 75% or 50% also does not necessarily mean the IELRB deemed the surveys inherently unreliable. Instead, this merely reflected a desire on the IELRB's part to minimize the possibility fee payors would be compelled to pay for any nonchargeable activities as a result of the lack of precision in calculating chargeable expenditures, which is permissible under the *Hudson* decision.

Contrary to petitioners' contentions, there is no evidence any NEA employees who purportedly convinced their superiors to include some of their activities in the chargeable category would not have been available to testify had petitioners chosen to call them as witnesses. Rather, the record reflects the NEA specifically informed petitioners any NEA employee not called as a witness would be made available to testify at the request of the petitioners, and all of the underlying documentation for the NEA's fair-share fee calculations was available to petitioners.

Furthermore, the IELRB did take account of the lack of specificity in some of the data provided by the NEA by disallowing the chargeability of expenditures for entire programs where the IELRB felt there was insufficient data to support the NEA's chargeability determinations. The petitioners' contention that the NEA's evidence should have consisted of time sheets coded by NEA employees to chargeable and nonchargeable activities does not provide a basis for reversal of the IELRB's decision. The descriptions of NEA programs and functions provided to the IELRB were sufficiently detailed to enable the IELRB to make chargeability determinations based on the descriptions of the NEA activities to which employees were required to key their work. The NEA exhibits, to which the petitioners refer in their reply brief, do not support their contention that many categories of NEA activities involve "chargeable and nonchargeable activities mixed within a single category." If the petitioners felt the descriptions of the various categories of NEA activities were inaccurate, confusing, or incomplete, they could have called NEA employees with supervisory authority over various activities to testify as to the nature of the activities for which they were responsible.

As petitioners point out, some of the NEA witnesses indicated in their testimony they were unfamiliar with the nature of various NEA activities. This is understandable given the number and variety of the various activities in which the NEA engages. Isolated instances of those who testified on the NEA's behalf not recalling details of specific NEA programs does not render the evidence submitted by the NEA unreliable as a basis for the IELRB's decision. Moreover, it is apparent the live testimony which the NEA presented was not in-

tended as substantive evidence as to the same matters covered by the summaries of employee time sheets, but instead was presented for the purpose of establishing the manner in which the NEA calculated its chargeable expenditures.

We next consider petitioners' argument that the use of hearsay evidence in this case violated their due process rights, and hearsay should not be admitted in cases where first amendment rights are at stake. In considering these arguments, we note many competing interests must be balanced in determining the evidentiary standards applicable to cases of this type. The right of objecting fee payors not to pay significant amounts for the support of union activities unrelated to collective bargaining must be balanced against the right of the unions to reimbursement for the services which they provide such fee payors. The right of the fee payors to insist the fair-share fee calculation have an adequate evidentiary basis must be balanced against the rights of all parties to the fee-determination proceedings to a reasonably prompt decision at the conclusion of proceedings which do not consume an inordinate amount of their limited resources. The proceedings in which fair-share fee objections are adjudicated must not be so expensive, complex, and burdensome that it would be more economical for unions to forego their rights to fair-share fees rather than to insist upon payment of the fees. Courts must be ever mindful of the *Hudson* Court's holding that absolute precision in the calculation of fair-share fees is neither expected nor required. Because of the varied and numerous factors which must be taken into account in cases of this type, the cases upon which petitioners rely in support of their due process argument and their argument concerning the evidentiary standards which should apply in cases involving first amendment rights are distinguishable. The competing interests which must be balanced in this case were simply not present in *In re Primus* (1978), 436 U.S. 412, 56 L. Ed. 2d 417, 98 S. Ct. 1893 (attorney discipline case), *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Comm'n* (1976), 429 U.S. 167, 50 L. Ed. 2d 376, 97 S. Ct. 421 (prior restraints on statements by school teachers at public board of education meetings on matters involving operation of schools), or *Morrissey v. Brewer* (1972), 408 U.S. 471, 33 L. Ed. 2d 484, 92 S. Ct. 2593 (due process requirements for revocation of parole). We conclude, in view of the competing interests involved in this case, the evidentiary standards applied by the IELRB did not offend against either the constitutional requirement of due process of law or the sanctity which has traditionally been accorded first amendment rights.

### F. ROUNDING OF CHARGEABLE PERCENTAGES OF IEA EXPENDITURES TO PROVIDE FOR A MARGIN OF ERROR

The petitioners object to the IELRB's method of rounding the percentages of time which some IEA employees spent on chargeable expenditures in an apparent effort to minimize the risk that costs of nonchargeable activities would be included in the chargeable category. The IELRB rounded the percentages of time which some, but not all, IEA employees spent on chargeable activities to 75% if the employee spent less than 100% but 75% or more of his or her time on a single category of chargeable activity, and to 50% if the employee spent less than 75% but 50% or more of his or her time on a single category of chargeable activity.

The IELRB maintains its rounding the chargeable percentages of the time of IEA employees down to either 75% or 50% invariably favored the fee payors, because it removed from their fair-share fees any potentially questionable expenditures.

A few examples illustrate the application of this procedure. Based on the survey of IEA vice-president Lee Betterman, the IEA considered 92% of her activities chargeable, 4% nonchargeable and 4% contested. Betterman's survey revealed 60% of her time was spent on "local governance," with the rest of her time divided among other categories. With respect to the chargeable percentage of Betterman's time, the IELRB stated:

> "We believe that Betterman could reasonably estimate that she spent at least half of her time on these activities and reliably confirm that with her calendar. We do not think that a more precise allocation in the remaining categories can be reliably made based on calendar entries up to 15 months old. We conclude that the Associations have proven that they may charge for 50 percent of [the expenditures for the IEA's vice-president's office]."

The survey of Ron Pierce, the IEA's program development manager, revealed 5% of his time was allocated to the contested category. However, Clayton Marquardt, who tabulated the survey results and made the IEA's final determination of chargeable expenditures, allocated 19% of Pierce's time to the contested category. In determining the amount of Pierce's time which was chargeable, the IELRB stated:

> "Pierce's survey is not consistent with Marquardt's allocation. Marquardt considered 19 percent to be contested, while Pierce only allocated 5 percent to [a contested] category ***. In any event, Pierce's survey shows that contract negotiation and administration dominated (55 percent) his time. We find that

Pierce could reasonably estimate that at least 50 percent of his time was spent on these activities and reliably confirm that with his calendar. A more precise allocation cannot be reliably made."

On her survey, IEA general counsel Lynne Siegel stated 72% of her time was spent on contract administration. The IELRB found Siegel "could reasonably estimate that at least 50% of her time was spent on contract administration and reliably confirm that with her calendar."

■ We conclude the procedure of which petitioners complain did not violate their constitutional rights. No discounts of time devoted to chargeable activities in order to provide for a margin of error in such calculations are constitutionally required. Thus, if anything, this procedure resulted in petitioners paying lesser amounts of IEA fair-share fees than they might otherwise be required to pay. For these reasons and because absolute precision in the calculation of fair-share fees is not required, we will not reverse the IELRB's decision on the basis of the method by which it rounded down the percentages of working hours which some IEA employees spent on chargeable activities.

### G. CHARGEABILITY OF SPECIFIC UNION ACTIVITIES

■ In *Ellis v. Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express & Station Employees* (1984), 466 U.S. 435, 448, 80 L. Ed. 2d 428, 442, 104 S. Ct. 1883, 1892, the Supreme Court articulated the following standard for determining whether union expenditures are chargeable to fee payors:

"[T]he test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit."

The Court then proceeded to consider the chargeability to fee payors of various specific categories of union expenditures. We will refer to these portions of the *Ellis* decision in our discussion of the specific union expenditures which petitioners challenge.

■ The courts have noted one important difference between col-

lective bargaining in the public sector, as opposed to the private sector, is that in the public sector, it is often necessary for a labor union to, in effect, obtain approval of a proposed contract by a legislative body through appropriation of the funds required to provide the wage and salary increases called for by the contract, in addition to obtaining the assent of the employing governmental agency or department to the terms of the contract. Thus, public employee unions, as a part of their collective-bargaining duties, must often engage in political activities in order to achieve what most private sector unions are able to achieve solely at the bargaining table. *Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782.

█ What we have previously observed in this opinion regarding the competing interests which must be balanced in cases of this type requires us to articulate a special standard regarding the burden of proof which obtains in these cases, where all union expenditures and activities during a given year are subject to scrutiny. Presentation in the unions' case in chief of evidence as to every single union expenditure and every specific union activity during the school years for which fair-share fees are claimed, would result in an unduly protracted hearing and an even larger record than that with which we were confronted in this case. We therefore hold, in cases involving calculation of national, State, and local union fair-share fees, the unions need only introduce evidence which establishes the fees claimed were calculated in a careful, conscientious, and trustworthy manner. This would include a description of the methodology used in the calculation of the fees, documents listing the total expenditures for each area of operations which the union concluded were chargeable and noncharge able, and detailed descriptions of the activities of each of the unions' operational areas, such as those contained in the NEA's program budget. Union employees should be required to keep contemporaneous records of the amount of time which they spend on various union activities and should, to the extent possible, be required to allocate their working hours to categories of activity which are commonly recognized as either chargeable or nonchargeable. Also, all documents supporting the unions' fair-share fee calculations should be made available to the objectors, and all union employees should be available to testify as witnesses on behalf of the objectors. Of course, the descriptions of the unions' activities must fully support the unions' chargeability determinations. Compliance with these requirements establishes a *prima facie* case that the unions' fair-share fee calculations are correct. (See *Kuehn v. American Federation of State, County & Municipal Employees, Council No. 65* (Minn. App. 1989), 435 N.W.2d

130, 135.) The burden then shifts to the petitioners to establish specific expenditures which the unions considered chargeable are not chargeable. At first glance, this procedure may appear to offend against the requirement that unions bear the burden of proving the chargeability of their expenditures, but it is necessitated by the equally important requirement that objectors must be afforded a reasonably prompt decision as to their objections.

The petitioners first challenge the IELRB's finding that 90% of the IEA expenditures contained in decision packages 120 and 121 are chargeable. These decision packages represent the expenditures for the IEA board of directors and its executive committee. Clayton Marquardt testified he reviewed the minutes of these meetings, determined how much time was spent on political and ideological matters, and tripled the amount of the time spent on such activities. On this basis, he allocated 90% of the activities of these committees to the chargeable category. As support for their contention this determination of the IELRB should be reversed, the petitioners contend political activities were discussed at most meetings of the executive committee, and the IELRB did not apply a "necessarily incurred" standard in determining whether the political activities of these committees were chargeable. The petitioners further suggest since the IELRB found only 56.25% of the IEA's activities were chargeable for 1986-87 and 57.40% for 1985-86, the activities of these committees, which are essentially "overhead," should be deemed chargeable in the same percentages.

We have independently reviewed the minutes of the meetings of these committees which the petitioners introduced into evidence. The bulk of the meetings were devoted largely to matters which are not political in nature, such as discussions of the number of bargaining units which would be negotiating contracts for the first time, the IEA bylaws, the IEA-NEA conventions, and the size of special education classes. Moreover, where legislative activity was discussed, the discussion often centered on proposed legislation which would have an impact on the working conditions of educational employees, such as legislation governing the rights of educational employees to transfer unused sick leave when they change their employment from one school district to another. Activities directed to enactment of legislation of this kind are chargeable to nonmember fee payors under the rationale of the *Abood* (431 U.S. 209, 52 L. Ed. 2d 261, 97 S. Ct. 1782) decision. In sum, the unions' evidence established a *prima facie* case as to the chargeability of 90% of the expenditures for the IEA's board of directors and its executive committee, and pe-

titioners did not present evidence sufficient to rebut the IEA's *prima facie* case. Petitioners' argument concerning the purported status of these expenditures as overhead expenditures will be discussed together with petitioners' contentions relating to other alleged overhead expenditures.

The petitioners generally contend the IELRB inconsistently and inexplicably treated various categories of the IEA's overhead expenditures, or expenditures benefitting all IEA departments, as 100% chargeable, while treating other similar expenditures as chargeable only to the extent of the average chargeable percentage of all other IEA expenditures. The petitioners assert all IEA expenditures which fall within the overhead category should only be deemed chargeable to the extent of the average percentage of chargeability of other IEA expenditures. In support of this argument, petitioners contend the IEA could reduce its operations by nearly half if it were performing only collective-bargaining functions (based on the average chargeable percentage of nonoverhead IEA expenditures) and thus overhead expenses could be reduced by nearly half if all activities unrelated to collective-bargaining were eliminated.

The unions and the IELRB argue the purported overhead expenditures which the IELRB held were 100% chargeable related to either internal union governance or the maintenance of the unions' organizational existence and thus were 100% chargeable under the *Ellis* (466 U.S. 435, 80 L. Ed. 2d 428, 104 S. Ct. 1883) decision. The respondents contend the fact that these expenditures also enabled the IEA to engage in nonchargeable activities is unavailing.

The following is a listing of the decision packages which form the basis for petitioners' contentions with regard to the chargeability of purported overhead expenditures:

| Decision Packages | Activities | Percentage held Chargeable |
|---|---|---|
| 120-21 | Board of Directors, Executive Committee | 90 |
| 122-25 | Budget, elections, staff retirement, bylaws | 100 |
| 160 | Regional rebate (funding provided to IEA regional councils for training programs and regional council meetings) | 90 |
| 161 | Reimbursement of expenses of IEA board members for attending regional council meetings and training sessions | 90 |

| 205 | Staff training and development (expense reimbursement to staff for attending management training conferences) | average chargeable percentage of other expenditures |
|---|---|---|
| 505 | Minority involvement training program (reimbursement of minority members for attendance at training conferences designed to encourage them to become more involved in IEA governance) | 100 |
| 506 | Local organizational development (expenses of local affiliates for training on organizational structure and development) | 100 |
| 700-703, 707 | Accounting, personnel, membership records | 100 |
| 705-706 | Interest expense, central office telephone-switchboard | average chargeable percentage of other expenditures |
| 708-713 | Central office building maintenance, utilities, real estate taxes, insurance for IEA property, IEA staff retirement plan, equipment for central office | average chargeable percentage of other expenditures |
| 716-717 | Insurance for retirees, principal payments on dues arrearages owed NEA | average chargeable percentage of other expenditures |
| 725 | Expenses of additional office in Northern part of State | average chargeable percentage of other expenditures |
| 750 | Contingency fund | average chargeable percentage of other expenditures |

■■■ The *Ellis* Court held nonmember fee payors may be compelled to pay their fair share of the costs of the annual conventions of their exclusive bargaining representatives. As its basis for this holding, the Court stated, "if a union is to perform its statutory functions, it must maintain its corporate or associational existence, must elect officers to manage and carry on its affairs, and may consult its members about overall bargaining goals and policy." (*Ellis*, 466 U.S. at 448, 80 L. Ed. 2d at 442, 104 S. Ct. at 1892.) Under this rationale, we held the IELRB did not err in its determination as to the chargeability of the expenditures contained in decision package Nos. 120, 121,

505, 506, 700-03, and 707. Most of the activities encompassed within these decision packages are useful, if not necessary, in maintaining the IEA's associational existence or that of its affiliated local unions. That some of the expenditures for these activities may have been less if the expenditures had not benefitted some nonchargeable activities is of no consequence under the *Ellis* decision. The expenses of most union conventions probably would be somewhat less if no business concerning nonchargeable activities was transacted, but the *entire* cost of union conventions is nevertheless chargeable to nonmember fee payors. See generally *Ellis*, 466 U.S. at 461, 80 L. Ed. 2d at 450, 104 S. Ct. at 1899 (Powell, J., dissenting).

The petitioners note the *Ellis* Court held expenses of union publications are not chargeable to the extent the publications report on nonchargeable activities. However, column inch counts of the portions of union publications pertaining to chargeable activities permit calculation of the nonchargeable portion of this category of union expenditures in a much more precise manner than is possible with regard to any other category of union expenditures.

The record reflects the funds expended for decision package Nos. 160 and 161 supported training programs and meetings of the IEA's 38 regional councils, and were also used to reimburse seven IEA board members for expenses which they incurred in attending those meeting and training programs. Marquardt testified the activities of the regional councils related almost entirely to internal governance, but membership recruitment material distributed at least once each year at those meetings could contain organizing brochures. Therefore, Marquardt was overly cautious and allocated 10% of the expenses of these decision packages to the contested category. There is no evidence which contradicts the unions' claims that 90% of the expenditures included in these decision packages were devoted to activities related to maintenance of the IEA's associational existence. The IELRB did not, therefore, err in its decision as to the chargeability of these two decision packages.

Decision package No. 205 was described by Marquardt as expense reimbursement to staff for attending management training conferences. Not all of the conferences were identified, and participation in the conferences apparently was not limited to only those IEA staff members who were involved in chargeable activities. Moreover, these conferences were not clearly related to maintenance of the IEA's associational existence. Therefore, the IELRB properly held the expenditures contained in this decision package were chargeable to nonmembers only to the extent of the average percentage of chargeability of

other nonoverhead IEA expenditures.

█ The IELRB did not err in holding the remaining decision packages were chargeable only to the extent of the average percentage of chargeability of other nonoverhead IEA expenditures. Most of the activities encompassed within these decision packages could properly be classified as overhead expenses, although some are arguably related to maintenance of the associational existence of the IEA. With respect to the amounts included in these decision packages which may have been expended for this or other fully chargeable activities, the petitioners can hardly be heard to complain the IELRB found some expenditures were not 100% chargeable which may, in fact, have been fully chargeable.

We next consider the chargeability of the NEA expenditures to which petitioners specifically object on appeal. Petitioners assert the IELRB erred in its determination as to the chargeability of a portion of the work of NEA employee John Dunlop, which was devoted to a study of the recent strikes at Trans World Airlines (TWA) and at the Hormel Company's Austin, Minnesota, plant. Dunlop is employed in the leadership training program of the NEA's affiliate services area. Pat Orrange, who testified concerning the affiliate services area's calculations of its chargeable expenditures, implied in her testimony that Dunlop researched these strikes in order to help the NEA determine whether to support the strikers. Dunlop related to Orrange he felt his time spent on researching these strikes was chargeable as long as the NEA did not take a position with respect to them, but would fall into the ideological domain and become nonchargeable if the NEA decided to support the strikers. Apparently the NEA decided not to do this, and Orrange included the time which Dunlop spent on this matter in the chargeable activities of the leadership training program of the affiliate services area.

Generally speaking, Mitchell Roth, in calculating the NEA's chargeable expenditures, deemed the expenditures for the leadership training program of the affiliate services area chargeable if they related to matters such as membership maintenance and nonchargeable if they related to activities such as recruitment of new members. The IELRB found the expenditures for the leadership training program which Roth deemed chargeable served to enhance the effectiveness of the unions in representing employees. On this basis, the IELRB concluded the NEA proved its calculation of chargeable expenditures for the leadership training program. (The time which Dunlop devoted to study of the TWA and Hormel labor disputes was not specifically mentioned in the IELRB's decision.)

■ We conclude the activities of Dunlop which are here at issue were chargeable to nonmember fee payors. We can sympathize with those fee payors who "see red" whenever any of their forced contributions are utilized for activities having anything at all to do with subjects as controversial as, for instance, the strike at the Austin, Minnesota, Hormel plant. However, because there is no evidence the NEA provided support to the unions or strikers involved in the TWA and Hormel labor disputes, we conclude the activities of John Dunlop which petitioners question were chargeable to fee payors.

Finally, the petitioners challenge some of the NEA's expenditures for its instructional and professional development (IPD) area of operations. Petitioners point out included in this area for the school years here at issue were activities such as publication of a book of computer programs for education, a program for development of new "student learning styles and teacher strategy," a parent-teacher project, and studies for early childhood development. They assert, "[n]one of these programs is by any stretch of the imagination, a subject that the local bargaining agent is required to implement or bargain over as part of its statutory duties," and the IPD program as a whole is clearly not chargeable because, "it is not even reasonably related to the union's duties as the exclusive bargaining agent."

Furthermore, petitioners observe the time sheets of various NEA employees involved in this program indicate they spent time on activities which petitioners view as political in nature. These include attending governors' conferences, monitoring legislative programs, attending meetings on the "New Right," and reviewing an "extremism kit." Petitioners apparently concede the expenditures for the IPD area relating to activities regarding teacher evaluations are chargeable, but maintain none of the other expenditures for this area related to chargeable activities.

The IELRB held the activities of the IPD area are not ideological, but instead relate to improvement of employees' working conditions and terms of employment and thus are reasonably related to the NEA's role of bargaining representative. The IELRB accepted the NEA's determination that all expenditures for the IPD area except contributions, donations, and expenditures for staff political activity—which totalled $1,931 (of a total area budget of $3,339,542)—were chargeable to nonmember fee payors. As the IELRB notes in its argument on appeal, it did not determine the bulk of the expenditures for the IPD area were chargeable solely because activities related to teacher evaluations were included in the area. The specific activities to which the petitioners allude in their argument on appeal were not

mentioned in the IELRB's decision.

The unions argue the IELRB properly held all of the expenditures for the IPD area were chargeable, except for the portion the NEA conceded was nonchargeable. The basis for this argument is the activities included in this area are "designed to help employees become more skilled and effective on the job, eliminate employer-employee friction, and improve the exclusive representative's chances for securing better compensation, benefits, and working conditions." The unions further contend many of the specific activities included in this area to which petitioners object are, in fact, chargeable. The unions tacitly acknowledge a few of the expenditures for this area which the NEA deemed chargeable may, in fact, have been related to nonchargeable activities (in addition to those which the NEA conceded to be nonchargeable), but assert the inclusion of expenditures for these activities in the chargeable category did not affect the fair-share fee determinations to the extent reversal of the IELRB's decision is required.

Activities related to improvement of working conditions or which are designed to improve the professional competence of members of the bargaining unit are chargeable to fee payors. (See, *e.g.*, *Ellis*, 466 U.S. 435, 80 L. Ed. 2d 428, 104 S. Ct. 1883; *Abels v. Monroe County Education Association* (Ind. App. 1986), 489 N.E.2d 533, 123 L.R.R.M. 3006.) For this reason, we conclude activities such as development of computer programs for education, development of new student learning styles and teacher strategy, teacher-parent projects, and studies for early childhood development fall within the chargeable category. Such activities have the effects, among others, of making the teacher's job easier, facilitating better rapport between teachers and the parents of their students, and making students more amenable to instruction. These programs, taken together with programs such as studies for early childhood development, can also improve the professional competence of teachers.

As the petitioners point out, one of the time sheets of NEA employee Sharon Robinson indicates she devoted an unspecified portion of a 7.5-hour day to "So. African visitors." Under the NEA's cost-center code system, Robinson's activities on that day were allocated to "Administrative Overhead" of the IPD area. Also, four 7.5-hour days listed on Robinson's time sheets were listed as being spent at the "National Governors' Assn. Mtg. Hilton Head, S.C." or "NGA Meeting, SC" and likewise charged to "Administrative Overhead" of the IPD area. Robinson's time sheets also contain an entry for a 7.5-hour day which reads, "Trenton, N.J.—Meeting with Gov. Kean," and an entry for a portion of another 7.5-hour day reads "Meeting with

Ruby King re: Legislative Monitoring." Both of these activities were likewise cost-coded to "Administrative Overhead" of the IPD area. On cross-examination, Roth was unable to provide specific details of Robinson's meetings with the South African visitors or with Governor Kean.

The time sheets of NEA employee Marcella Dianda indicate she spent one hour reviewing an "extremism kit." This activity was cost-coded to program 1.1 ("Teacher Education and Certification—NCATE") of function 1.0 ("Excellence in Education Profession") of the IPD area. Also, Dianda spent two hours on "Mtng on New Right," which was assigned the same cost-center code as her work on the "extremism kit."

Roth testified on cross-examination he understood the "extremism kit" is "an instructional aid for teacher members as to how to address that particular issue in their classrooms." He indicated the NEA definitely considers groups such as the Ku Klux Klan to be extremist and was not sure whether the National Right to Work Foundation and the Moral Majority fell within the NEA's definition of extremist groups. With respect to what the NEA means by the "New Right," Roth testified:

> "Well, honestly, I'm not a hundred percent sure what it means by the new right. I believe it means to the extent that there's a new movement politically towards more conservative view of politics and of education issues that the, in terms of education issues, the, oh how do I refer to it as those groups or people who may have a more conservative approach towards what should be taught in the classroom, what sort of methods should be used, what sort of, oh, training teachers should have. Its all part of, at least for this particular program, for instance, all part of the response to the education reform movement that has come within the past couple of years. So, I wish I could be more specific in terms of listing organization, but I can't, on behalf of NEA, list the organizations.
>
> Q. It might include the organizations dealing with prayer in schools?
>
> A. It possibly might.
>
> Q. Or teaching of creationism versus evolution in the schools?
>
> A. It possibly might, yes."

Roth stated the NEA concluded both of the above-mentioned activities on the part of Dianda were chargeable.

The NEA established a *prima facie* case all activities of Robinson

were chargeable by presenting evidence which established the IPD area generally undertook activities designed to improve employees' working conditions and professional competency. This applies to the meeting with the South African visitors, since this meeting could just as well have been devoted to a discussion, for instance, of instructional techniques as to any other topic. When petitioners failed to establish the nonchargeability of the activities of Robinson which they questioned through cross-examination of Roth, they should have called Robinson as a witness and examined her concerning those activities. Having failed to do so, petitioners did not rebut the unions' *prima facie* case as to the chargeability of those activities.

On the basis of Roth's testimony, we conclude, however, the petitioners rebutted the unions' *prima facie* case as to the chargeability of the work of Marcella Dianda on activities relating to the "extremism kit" and the "New Right." According to Roth's descriptions of these activities, they may indeed contribute to an improvement of the working conditions of teachers in that they may provide a suggested means of responding to student questions or comments concerning organizations such as the Ku Klux Klan and matters such as the creation versus evolution debate. But the very fact the NEA singles out certain organizations or ideas for special treatment in classroom discussions necessarily has the effect of either stigmatizing or benefitting those organizations or ideas. Those fee payors who find themselves on the opposite side of the NEA's positions respecting such matters can rightly say a portion of their fair-share fees is being used to disseminate political or ideological beliefs to which they are opposed.

The fact some of the organizations which the NEA discusses or mentions in its "extremism kit" or materials relating to the "New Right" may be despised by the great majority of Americans is of no consequence with regard to the first amendment rights of fee payors not to be compelled to subsidize those activities. The first amendment protects the free expression of *all* views, however reprehensible they may be to the great majority of citizens. (See, *e.g.*, *Village of Skokie v. National Socialist Party of America* (1978), 69 Ill. 2d 605, 373 N.E.2d 21.) It follows nonmember fee payors may not be compelled to subsidize the dissemination of materials which might tend to cast aspersions on various organizations and beliefs, even ones which are highly repugnant to most of the population. For these reasons, we hold Marcella Dianda's work on activities related to an "extremism kit" and to the "New Right" is not chargeable to nonmember fee payors.

Our conclusion regarding the above-described activities of Dianda does not, however, require reversal of the portion of the IELRB's decision which determined the chargeable percentages of NEA expenditures. Even assuming Dianda was compensated at the rate of $100 per hour for the three hours which she devoted to these activities, the amount of her compensation for this work would be insignificant compared to the total annual NEA expenditures of approximately $100 million. Thus, the inclusion of Dianda's work on the "extremism kit" and the "New Right" in the NEA's chargeable activities had a *de minimus* impact on the amount of the petitioners' fair-share fees and does not require recalculation of the amount of those fees.

After oral argument, the parties to this appeal filed numerous motions for leave to file various recent decisions as supplemental authority. We allow all of these motions. We have examined all of the recent decisions cited by the parties in view of the conclusions which we reach in this opinion. To the extent these recent decisions state conclusions different from those reached in this opinion, we are unpersuaded by their logic, and we decline to follow them.

In summary, we affirm the IELRB's decision in all respects, except to the extent it requires the Alton petitioners to pay fair-share fees. Within 30 days of the filing of this court's mandate in this cause, the IELRB is to set a date for a hearing on the fair-share fee objections of the Alton petitioners for the school years here at issue and thereafter conduct such further proceedings with regard to those objections as may be appropriate in accordance with the views expressed in this opinion.

Affirmed in part; reversed in part and remanded with directions.

LUND and GREEN, JJ., concur.